STATE v. PATEL

[217 N.C. App. 50 (2011)]

━━━━━━━━

STATE OF NORTH CAROLINA v. HARISH PURUSHOTTAMDAS PATEL

No. COA10-1564

(Filed 15 November 2011)

## 1. Homicide—first-degree murder—sufficiency of evidence

The trial court did not err when it denied defendant's motion to dismiss a charge of first-degree murder for insufficient evidence. Taken in the light most favorable to the State, there was evidence of motive including two prior attacks on the victim; evidence of opportunity including the victim saying that she was

going to defendant's apartment on the day of the murder and the presence of her car at defendant's apartment complex long after she was dead; evidence of means in defendant's purchase of gas and a gas can the morning of the murder and the burning of the body, with gasoline detected at the scene; and an inculpatory statement by defendant.

## 2. Homicide—first-degree murder—sufficiency of evidence— premeditation and deliberation

There was sufficient evidence of premeditation and deliberation in a first-degree murder prosecution in defendant's conduct before the murder and in disposing of the body. The State presented evidence that included defendant twice threatening and choking the victim, his wife, before the murder as well as buying a gas can and gas (the body was burned) and cancelling an appointment.

## 3. Constitutional Law—effective assistance of counsel—cold record

A first-degree murder defendant's assignment of error alleging ineffective assistance of counsel was dismissed without prejudice to reassert the claim in a motion for appropriate relief where defense counsel first challenged jurisdiction and then stipulated jurisdiction and requested that the jury not be instructed on the issue. The Court of Appeals could not tell from the cold record whether there was a strategic reason for the stipulation.

Appeal by defendant from judgment entered 18 December 2009 by Judge Michael R. Morgan in Wake County Superior Court. Heard in the Court of Appeals 17 August 2011.

*Attorney General Roy Cooper, by Special Deputy Attorney General Jonathan Babb, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for defendant-appellant.*

GEER, Judge.

Defendant Harish Purushottamdas Patel appeals from his conviction of first degree murder. Defendant primarily argues on appeal that the trial court erred in denying his motion to dismiss on the ground of insufficient evidence. When, however, all of the evidence is viewed in the light most favorable to the State, as required by the standard of review, there is sufficient evidence to allow a jury to find that defend-

ant was the perpetrator of the offense and that defendant formed the specific intent to kill after premeditation and deliberation. The trial court, therefore, correctly denied defendant's motion to dismiss.

Facts

The State's evidence tended to show the following facts. In 2005, Vanlata Patel and defendant, who were married, moved to Cary, North Carolina.[1] On 14 September 2007, Vanlata checked into a hotel near the airport, not far from their home. Tierena King, a hotel employee, "could tell something wasn't right" when Vanlata arrived at the hotel. She thought that Vanlata seemed in "a rush just to get safe." Vanlata asked Ms. King not to transfer any calls to her room.

Later that evening, Vanlata asked Ms. King how long it would take to get a taxi. When Ms. King replied that it would take 15 minutes, Vanlata responded that she did not have 15 minutes. Vanlata explained that she was leaving her husband and needed to get some jewelry that her mother had given her while her husband was out of the apartment. She told Ms. King that her husband had choked her and had threatened to kill her. Ms. King gave Vanlata a ride to her apartment. In the car, Vanlata was very emotional, expressing fear that defendant might be at the apartment.

Vanlata retrieved a box from the apartment and returned to Ms. King's car. She told Ms. King that her son's friend had given her money for a plane ticket to Canada, where her son lived. The next day, Vanlata flew to Vancouver, Canada to stay with her son from a previous marriage, Ashesh Patel.

Vanlata later told Ashesh's wife, Priya, that defendant was abusive, and, according to Priya, Vanlata "was convinced that she was going to die if she continued to live with him." She explained that defendant had choked her on two occasions. Vanlata also told Priya that, during the second attack, she "was sure she was going to die, and in his eyes she could see that he was going to kill her." The second incident was so severe that Vanlata lost her voice. Because of this attack, Vanlata was afraid for her safety.

Vanlata returned to North Carolina on 5 November 2007 and met with Attorney Corrie Seagroves to initiate divorce proceedings. She told Ms. Seagroves that she wanted to file suit for equitable distribu-

---

1. To avoid confusion, because a number of people related to this case have the last name "Patel," we refer to those individuals by their first names throughout this opinion.

tion. Vanlata was worried that defendant might prevent her from accessing their financial assets. According to Vanlata, defendant had previously forged her son Ashesh's name to take money sent to him from his grandparents.

During her conversation with Ms. Seagroves, Vanlata talked about the two incidents when defendant had choked her. Ms. Seagroves suggested that Vanlata obtain a domestic violence protective order, but Vanlata did not want to apply for one. Vanlata explained that members of her culture did not like to involve the police in their personal affairs, and if defendant "wanted to harm her, that a piece of paper was not going to stop him." Ms. Seagroves filed the divorce complaint that afternoon.

The day after their meeting, Vanlata called Ms. Seagroves sounding upset. Defendant had parked outside the house of her niece and nephew—where Vanlata was staying—and would not leave. Her niece and nephew did not want to call the police and eventually invited defendant inside. Vanlata locked herself in a bedroom to call Ms. Seagroves. During their conversation, Ms. Seagroves heard a very loud bang. Vanlata told Ms. Seagroves that defendant had just come through the bedroom door. Ms. Seagroves then heard defendant asking Vanlata who she was speaking to on the phone. When Vanlata revealed that she was speaking to her lawyer, defendant got on the phone. Ms. Seagroves warned defendant to leave the residence and threatened to call the police. After defendant stepped away from the phone, Ms. Seagroves heard him say, "[Y]ou are inviting trouble" and "something else . . . like you're going down."

Later, both parties expressed interest in settling the divorce case, but they did not reach an agreement before Vanlata returned to Canada later that month. On 10 January 2008, Vanlata returned again to North Carolina to meet with Ms. Seagroves in preparation for an interim distribution hearing scheduled for the next day. At the hearing, the judge awarded Vanlata the couple's Nissan Sentra as well as certain other assets. After the hearing, Ms. Seagroves drove Vanlata to defendant's apartment to take possession of the Nissan and some personal property. Defendant arrived at the apartment shortly thereafter in the Nissan. Four days later, on 14 January 2008, Vanlata reported to Ms. Seagroves that she had met defendant at the mall with a friend over the weekend, and the parties had reached a settlement agreement.

During her January visit, Vanlata stayed with friends, Pankaj and Raxa Patel. Raxa testified that Vanlata "was very scared" of defend-

**STATE v. PATEL**

[217 N.C. App. 50 (2011)]

ant. On 15 January 2008, defendant had dinner at Pankaj and Raxa's house. Vanlata left the house before defendant arrived. After dinner, defendant went next door where Pankaj's nephew, Pratik, lived and started looking around; defendant said that he was looking for Vanlata. Vanlata returned to Pankaj and Raxa's house after defendant had left and parked the Nissan in their driveway.

Vanlata told Raxa—as well as Ms. Seagroves, Vanlata's mother, and Vanlata's brother—that she planned to return to defendant's residence on 16 January 2008 to pick up her computer and a few personal items before her return flight to Canada on 17 January 2008. When Raxa left for work on 16 January 2008 at 9:15 a.m., Vanlata had a phone in her hand and explained that she was going to call defendant. Phone records showed a telephone call from Pankaj and Raxa's house to defendant's apartment, lasting from 9:20 a.m. to 9:27 a.m.

Pratik placed calls to defendant's residence using his cell phone from 9:52 a.m. to 9:54 a.m. and then again from 9:54 a.m. to 9:58 a.m. Pratik was asking defendant to accompany him to help his sister file for social security. Defendant replied, "[N]o, no, no, no, don't come. Don't call. I'm very busy. Don't come. Don't call." Pratik did not go to defendant's apartment that morning. He thought, however, that the conversation was "very strange."

At 10:05 a.m., defendant walked into a Cary Circle K gas station. At 10:09 a.m., defendant purchased a gas can and gas. Phone records showed a second telephone call from Pankaj and Raxa's house to defendant's apartment at 10:34 a.m. At 10:35 a.m., defendant called his regular table tennis partner and canceled their 1:30 p.m. scheduled match. Vanlata and the Nissan had left Pankaj and Raxa's house at some time before Pankaj woke up, after working the night shift, between 1:00 p.m. and 2:00 p.m.

At approximately 2:30 p.m., authorities in Mecklenburg County, Virginia received reports of a brush fire on the shoulder of I-85 north between mile markers 18 and 19. Once at the scene, law enforcement found a burning body with a green paisley and floral quilted fabric found underneath it. The watch found on the body had stopped at 2:28 p.m. Law enforcement subsequently determined that the body was the origin of the fire, and that an accelerant was used. A wild fire investigator on the scene smelled gasoline.

When a resident of defendant's apartment complex went to dinner at 5:30 p.m. that evening, there was no car parked beside his. When he returned between 7:30 p.m. and 8:00 p.m., however, Vanlata's

Nissan was backed into a spot next to the one where his car was parked. The resident had never seen the Nissan in that area of the parking lot prior to 16 January 2008.

The next day, 17 January 2008, Pankaj called Ashesh to tell him that Vanlata was missing. That afternoon, the Cary Police Department became involved. On 19 January 2008, Cary detectives spoke with defendant. Defendant said that he had last seen Vanlata on 12 January 2008 for their meeting at the mall to discuss the settlement.

On 20 January 2008, employees of the Mecklenburg County Sheriff's Office in Virginia learned about the missing Cary woman. That day, a Mecklenburg County, Virginia Investigator and a Cary Detective interviewed defendant in Cary. When asked about his whereabouts on 16 January 2008, defendant did not say anything about his trip to the gas station. Defendant claimed that he had gone to South Point Mall from 12:00 p.m. to 4:00 p.m. and had eaten "Italian at Sabinos." Cary police subsequently reviewed video footage from the mall—even though there is no Sbarro's at South Point Mall—and saw no sign of defendant.[2]

Subsequently, the body found on the shoulder of I-85 in Virginia was confirmed to be Vanlata Patel. On 23 January 2008, Cary police interviewed defendant again. Detective George Daniels informed defendant that his wife's body had been discovered in Virginia. During this interview, defendant gave another account of his activities on 16 January 2008 that included his trip to the Circle K gas station in Cary. Defendant told Detective Daniels that he got ready for the day, checked his e-mail, and went to purchase gasoline. Then, according to Detective Daniels, defendant backtracked and said that on his way to the gas station, he saw a man who had run out of gas and pulled over to assist him. According to defendant, the man, whose race defendant could not identify and whom he could not describe, gave him $20.00 in return for defendant's buying him gas. Defendant claimed that he paid with a credit card at the gas station and kept the $20.00 as well as the gas can.

After the interview, Detective Michael Lindley gave defendant a ride back to his apartment, but defendant could not re-enter the apartment because officers were conducting a search. While sitting in the car, defendant told the detective that "it was his wife's fate to die," and "if I go to jail, I go to jail, that would be my fate."

---

2. It seems law enforcement assumed that defendant meant Sbarro's.

During the 23 January 2008 search, law enforcement found the gas can at defendant's apartment. Cary Detective Jim Young examined the gas can. Upon reviewing the manufacturer's instructions, he learned that the gas can's cap needed to be removed from the can's collar in order to dispense gas using the spout. Detective Young found, however, that the cap had not been removed and was still attached to the collar. Although he took the appropriate steps, he was unable to remove the cap from the collar.

On 30 January 2008, defendant reported having suicidal thoughts. Officer Donna Pell and another officer took defendant to Wake Medical Health. At the facility, defendant told Officer Pell, "[I]f I'm guilty, then I'm guilty, and I will accept my punishment, but I want them to be a hundred percent positive." On 7 February 2008, defendant again spoke with Officer Pell about his wife's disappearance and told her "he wanted to get through this, to put it behind him and become a better person, to make sure he did not do this again."

An expert in forensic pathology performed the autopsy on Vanlata and found the cause of death to be "homicidal violence of undetermined type." Evidence indicated that Vanlata was not breathing when the fire began. An expert in forensic fiber comparison and identification determined that a fiber found in the trunk of defendant's Subaru was consistent with fibers from the green paisley and floral bedding found under Vanlata's body.

On 26 February 2008, defendant was indicted for the first degree murder of Vanlata. Before trial, defense counsel filed a motion to dismiss on the ground that the trial court lacked jurisdiction because the evidence did not establish beyond a reasonable doubt that Vanlata was killed within the territorial boundaries of North Carolina. Both parties agreed that the court should address the issue at the close of the State's evidence. After the State rested its case, defense counsel moved to dismiss for lack of jurisdiction. The State asked the court to deny the motion to dismiss, but noted that the court should instruct the jury to make a special finding as to jurisdiction. Taking the evidence in the light most favorable to the State, the trial court denied the motion to dismiss for lack of jurisdiction.

The court later invited both parties to offer their input regarding the special verdict as to jurisdiction. The State contended that a jurisdictional instruction was necessary and that the court had a "duty" to give such an instruction in this case. Defense counsel, however, "requested specifically the jury not be instructed on [jurisdiction]" and

**STATE v. PATEL**

[217 N.C. App. 50 (2011)]

explained, "I think this Court has jurisdiction, that this state has jurisdiction over this case, and I'm not going to argue they don't at this point." The State noted that it did not understand defense counsel's changed position, stating "this is a heck of an issue on appeal." Upon further questioning, defense counsel clarified, "there's not an issue, a factual issue, and we're raising no factual issue as to whether North Carolina has jurisdiction. We are not disputing that North Carolina has jurisdiction in this case."

The State requested that the court obtain an admission of jurisdiction from defendant himself. After asking defendant to rise, Judge Morgan had the following conversation with defendant:

> [THE COURT:] Mr. Patel, do you understand that you have a right to have a jury to determine as a matter of a special verdict as to jurisdiction whether or not the State of North Carolina has jurisdiction to try the Defendant?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Has your lawyer . . . explained to you this special verdict as to jurisdiction opportunity?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Do you understand the aspects of the special verdict as to jurisdiction as explained to you by your attorney . . .?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Do you agree that North Carolina has jurisdiction to try you in this first degree murder case?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: In agreeing that the State of North Carolina has jurisdiction to try you in this first degree murder case, do you agree as your counsel has stated, that there is no need to submit as a special verdict as to jurisdiction the option to the jury as to whether or not the State of North Carolina has or does not have jurisdiction to try you in this case?
>
> THE DEFENDANT: Yes, Your Honor.

In light of the stipulation, the court did not submit the issue of jurisdiction to the jury.

The jury found defendant guilty of first degree murder, and defendant was sentenced to life imprisonment without parole. Defendant timely appealed to this Court.

I

[1] Defendant contends that the trial court erred when it denied his motion to dismiss on the ground of insufficient evidence. "This Court reviews the trial court's denial of a motion to dismiss *de novo.*" *State v. Smith,* 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense.' " *State v. Lowry,* 198 N.C. App. 457, 465, 679 S.E.2d 865, 870 (quoting *State v. Powell,* 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980)), *cert. denied,* 363 N.C. 660, 686 S.E.2d 899 (2009).

"Substantial evidence is that amount of relevant evidence necessary to persuade a rational juror to accept a conclusion." *State v. Mann,* 355 N.C. 294, 301, 560 S.E.2d 776, 781 (2002). "When reviewing a motion to dismiss based on insufficiency of the evidence, this Court must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences." *State v. Bullock,* 178 N.C. App. 460, 466, 631 S.E.2d 868, 873 (2006).

Defendant first contends that the evidence was insufficient for a reasonable juror to conclude that defendant was the perpetrator. As the *Lowry* Court explained,

"[a]lthough the language is by no means consistent, courts often speak in terms of proof of motive, opportunity, capability and identity, all of which are merely different ways to show that a particular person committed a particular crime. In most cases these factors are not essential elements of the crime, but instead are circumstances which are relevant to identify an accused as the perpetrator of a crime.

. . . While the cases do not generally indicate what weight is to be given evidence of these various factors, a few rough rules do appear. It is clear, for instance, that evidence of *either* motive or opportunity alone is insufficient to carry a case to the jury. . . . [W]hen the question is whether evidence of *both* motive and opportunity will be sufficient to survive a motion to dismiss, the answer is much less clear. The answer appears to rest more upon

the strength of the evidence of motive and opportunity, as well as other available evidence, rather than an easily quantifiable 'bright line' test."

198 N.C. App. at 466, 679 S.E.2d at 870-71 (quoting *State v. Bell*, 65 N.C. App. 234, 238-39, 309 S.E.2d 464, 467-68 (1983), *aff'd per curiam*, 311 N.C. 299, 316 S.E.2d 72 (1984)).

Here, viewed in the light most favorable to the State, the State's evidence of motive included defendant's two prior attacks on Vanlata, his threat that she was "inviting trouble" and was "going down," and Vanlata's expressed fear of defendant. *See e.g., State v. Hayden*, ___ N.C. App. ___, ___, 711 S.E.2d 492, 495 ("This Court has, in the past, held that evidence of a defendant's history of threats or physical abuse of the victim constitute evidence of defendant's motive to kill that victim."), *disc. review denied*, ___ N.C. ___, ___ S.E.2d ___, 2011 N.C. LEXIS 821, 2011 WL 4638739 (Oct. 6, 2011). Further, Vanlata and defendant were in the midst of a divorce, which had included a dispute over equitable distribution.

The State also presented sufficient evidence of opportunity and means. Evidence of opportunity included evidence that Vanlata told several people that she was going to defendant's apartment the day of the murder and that she called defendant twice that morning. Defendant told his nephew not to come to his apartment, defendant canceled his tennis match for that afternoon, and no evidence supported his proposed alibi. The night of Vanlata's murder, her Nissan was parked—long after she was dead—in a spot in defendant's apartment complex away from defendant's apartment. Moreover, a fiber found in the trunk of defendant's Subaru was consistent with the fibers found under Vanlata's body. *See, e.g., State v. Banks*, ___ N.C. App. ___, ___, 706 S.E.2d 807, 813 (2011) (finding evidence sufficient where, along with other evidence, red fiber consistent with victim's jacket was recovered from defendant's car).

Evidence of means included defendant's purchase of gas and a gas can the morning of the murder. After the murder, law enforcement determined that Vanlata's body had been burned with an accelerant, and an investigator smelled gasoline at the crime scene.

In addition to the evidence of motive, opportunity, and means, defendant made an inculpatory statement when he told Officer Pell that "he wanted to get through this, to put it behind him and become a better person, to make sure he did not do this again." *See, e.g., State v. Lambert*, 341 N.C. 36, 43, 460 S.E.2d 123, 127 (1995) (holding defend-

ant's statement—" 'Honey, why did you make me do it?' "—was inculpatory where reasonable juror could infer " 'it' " referred to the murder). Further, defendant initially failed to disclose his trip to the gas station, and the State was able to raise questions regarding the credibility of his explanation for that trip, including evidence that would permit the jury to find that the gas can could not be used to put gas into a car and defendant's inability to provide any description of the man he purportedly helped.

Taken as a whole, the evidence in this case is analogous to the evidence presented in cases where our courts have held that there was sufficient evidence to withstand the defendant's motion to dismiss. *See, e.g., id.* at 41-42, 460 S.E.2d at 126-27 (holding evidence sufficient where victim was planning to leave wife, wife was in mobile home with husband when he was shot, police found murder weapon in mobile home, and wife made inculpatory statement); *Banks,* ___ N.C. App. at ___, 706 S.E.2d at 813 (holding evidence sufficient where defendant threatened victim, four spent casings found in defendant's bedroom were fired from murder weapon, and red fiber consistent with victim's jacket was recovered from defendant's car); *State v. Parker,* 113 N.C. App. 216, 223, 438 S.E.2d 745, 749 (1994) (holding evidence sufficient where defendant conducted surveillance of victim, possessed two guns, threatened to kill victim, and was present near crime scene; further, defendant's brand of cigarette package was on road where victim was found).

Although defendant relies on two cases in which our Supreme Court found the evidence insufficient to prove that the defendant murdered the woman with whom he lived, the evidence in those cases is not comparable. In *State v. Lee,* 294 N.C. 299, 301, 240 S.E.2d 449, 450 (1978), and *State v. Furr,* 292 N.C. 711, 714, 235 S.E.2d 193, 195 (1977), the State presented evidence of prior threats by the defendant to kill the victim (and, in *Lee,* prior beatings). In neither case, however, was the State able to present any evidence placing the defendant with the murdered victim at the time of the murder. *Lee,* 294 N.C. at 300-01, 240 S.E.2d at 450; *Furr,* 292 N.C. at 717, 235 S.E.2d at 197. Further, there was no evidence linking either defendant to the murder scene or tying him to the means by which the victim was killed. *Lee,* 294 N.C. at 301, 240 S.E.2d at 450; *Furr,* 292 N.C. at 717, 235 S.E.2d at 197.

In short, in each case, there was evidence of motive, but no actual evidence allowing the jury to find that the defendant had the opportunity to kill the victim or access to the means used to kill the victim.

*See Lowry*, 198 N.C. App. at 467, 679 S.E.2d at 871 (characterizing *Lee* and *Furr* as cases in which "the State presented evidence of motive, but not opportunity"). In this case, however, the State did not rely upon only motive—it also offered evidence placing Vanlata (and her car) at defendant's apartment at the time she would have been murdered and evidence of defendant's purchase, just hours before Vanlata's body was burned, of a gas can and gas.

'The State also relied upon statements by defendant that could be construed by the jury as admissions. Defendant argues those statements are not sufficient and points to the Supreme Court's holding in *Furr* that the following statement was not inculpatory: " 'Well, you'all [sic] know who did it and I know who did it, but nobody else will ever know but me.' " *Furr*, 292 N.C. at 718, 235 S.E.2d at 198. That remark, however, tended "to show only that he knew who killed his wife, not that he did so himself." *Id.* at 719, 235 S.E.2d at 198. Here, by contrast, defendant told Officer Pell "he wanted to get through this, to put it behind him and become a better person, *to make sure he did not do this again.*" (Emphasis added.) This statement suggests that defendant was the perpetrator and not simply that he knew the identity of the perpetrator.

Unlike in *Lee* and *Furr*, the evidence in this case—taken as a whole in the light most favorable to the State—allows for the reasonable inference that defendant was the perpetrator. The trial court, therefore, did not err in denying defendant's motion to dismiss on that ground.

[2] Defendant also contends that the evidence was insufficient for a reasonable juror to conclude that defendant formed the specific intent to kill after premeditation and deliberation. In order for a killing to be premeditated, it must be "thought out beforehand for some length of time, however short." *State v. Hunt*, 330 N.C. 425, 427, 410 S.E.2d 478, 480 (1991). "Deliberation means an intent to kill carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion, suddenly aroused by lawful or just cause or legal provocation." *Id.*

In arguing that there was insufficient evidence of premeditation and deliberation, defendant contends that the evidence did not show ill will by defendant toward Vanlata, that the cause of death was not the kind of violence associated with premeditated murder and that the death may have been the product of "some sudden and thought-

less act." In making this argument, however, defendant ignores the standard of review by viewing the evidence in the light most favorable to defendant rather than in the light most favorable to the State.

Our Supreme Court has explained that

> [p]remeditation and deliberation generally must be established by circumstantial evidence, because both are processes of the mind not ordinarily susceptible to proof by direct evidence. Among the circumstances to be considered in determining whether a killing was done with premeditation and deliberation is the conduct and statements of the defendant before and after the killing. Further, any unseemly conduct towards the corpse of the person slain, or any indignity offered it by the slayer, as well as concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying.

*State v. Rose*, 335 N.C. 301, 318, 439 S.E.2d 518, 527 (1994) (internal citations and quotation marks omitted), *overruled in part on other grounds by State v. Buchanan*, 353 N.C. 332, 543 S.E.2d 823 (2001). *See also State v. Battle*, 322 N.C. 69, 72-73, 366 S.E.2d 454, 456-57 (1988) (finding sufficient evidence of premeditation and deliberation, including "conduct and statements of defendant before and after the killing").

The State, in this case, presented evidence that before Vanlata's murder, defendant threatened her and choked her twice. On the morning of the murder, defendant purchased a gas can and gas after speaking with Vanlata who had told others that she was going to call defendant about going to pick up belongings at his apartment. When defendant returned to his apartment and spoke again with Vanlata at 10:34, he immediately then called to cancel a 1:30 appointment. Viewed in the light most favorable to the State, this conduct before the murder constitutes evidence of premeditation and deliberation.

Moreover, the fact that Vanlata's body was burned after she was killed constitutes additional evidence of premeditation and deliberation. *See Rose*, 335 N.C. at 317, 439 S.E.2d at 527 ("Defendant first argues that his conduct in burning the body a day after the killing was not relevant to prove premeditation or deliberation. We disagree."). In *Rose*, the defendant purchased gasoline, dug a grave and inserted the body, poured gasoline on the body, and started a fire. *Id.* at 318, 439 S.E.2d at 527. The Court held that the "[d]efendant's handling of

the body from the time of the killing until the body was finally burned and buried is evidence from which a jury could infer premeditation and deliberation." *Id.* at 319, 439 S.E.2d at 527. *See also Battle*, 322 . N.C. at 73, 366 S.E.2d at 457 (finding that defendant's demand that two witnesses help him dispose of victim's body by burning it was evidence of premeditation and deliberation).

Here, in the light most favorable to the State, the evidence of defendant's conduct both before the murder and in disposing of the body after the murder was sufficient for a reasonable juror to conclude that defendant killed Vanlata with premeditation and deliberation. Because the State presented sufficient evidence that defendant was the perpetrator and that he premeditated and deliberated, the trial court properly denied defendant's motion to dismiss.

II

**[3]** Defendant also contends that he was deprived of his state and federal constitutional right to effective assistance of counsel because his trial attorney reversed course and withdrew the jurisdictional challenge. Specifically, defendant contends trial counsel's request that the jury not be instructed on the jurisdiction issue and defendant's stipulation that North Carolina has jurisdiction constitutes ineffective assistance of counsel ("IAC").

The United States Supreme Court has held that IAC claims should rarely be raised on direct appeal because

[i]f the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse.

*Massaro v. United States*, 538 U.S. 500, 505, 155 L. Ed. 2d 714, 720, 123 S. Ct. 1690, 1694 (2003).

Our Supreme Court, in a decision prior to *Massaro*, held that "IAC claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required . . . ." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001). If, however, "the reviewing court determine[s] that IAC claims have been prematurely asserted on direct appeal, it shall dismiss those claims without prejudice to the defendant's right to reassert them during a subsequent [motion for appropriate relief] proceeding." *Id.* at 167, 557 S.E.2d at 525.

Here, the record only indicates that the stipulation was not a casual decision. The record does not reveal why defense counsel reversed course. Defendant contends that "there is no conceivable trial strategy" for eliminating a "major hurdle" that the State would need to overcome in order to procure a conviction. The State, by contrast, speculates that defense counsel may have chosen to withdraw the jurisdictional challenge in order to avoid a capital charge in Virginia.

It is indeed possible that stipulating jurisdiction was a strategic decision. *See, e.g., Bierenbaum v. Graham*, 607 F.3d 36, 59 (2d Cir. 2010) (holding defense counsel's failure to request territorial jurisdiction instruction did not constitute IAC because "counsel could reasonably have concluded that it made no sense to request a territorial jurisdiction instruction—unsupported by any evidence—that contradicted the defense's theory of the case"), *cert. denied*, ___ U.S. ___, 179 L. Ed. 2d 645, 131 S. Ct. 1693 (2011). Because we cannot determine from the cold record whether defense counsel in this case had a strategic reason for stipulating that North Carolina has jurisdiction, we dismiss this assignment of error without prejudice to defendant's right to reassert his claim in a motion for appropriate relief.

No error.

Judges BRYANT and BEASLEY concur.