An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA14-368

Filed: 21 April 2015

Forsyth County, Nos. 06 CRS 63107, 06 CRS 63144

STATE OF NORTH CAROLINA,

v.

SCOTT ROBERT SPEAKMAN, Defendant.

Appeal by defendant from judgments entered 19 August 2013 by Judge William Z. Wood, Jr. in Forsyth County Superior Court. Heard in the Court of Appeals 11 September 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Derrick C. Mertz, for the State.*

> *Parish & Cooke, by James R. Parish, for defendant-appellant.*

GEER, Judge.

Defendant Scott Robert Speakman appeals from judgments sentencing him for first degree murder and the burning of personal property. On appeal, defendant primarily argues that the trial court erred in failing to dismiss the first degree murder charge due to insufficient evidence of premeditation and deliberation. Our review of the record, however, reveals abundant evidence from which the jury could have found premeditation and deliberation, including evidence that the murder was

accomplished by strangulation. We, therefore, hold that the trial court did not err in denying the motion to dismiss.

Facts

The State presented evidence that tended to show the following facts. In June 2006, while defendant was staying at a homeless shelter in Silver Springs, Maryland, Derek Nichols, who lived a couple miles from the shelter, recruited defendant as a day laborer for construction work. While defendant worked for Mr. Nichols, Mr. Nichols came to depend on defendant as a good and reliable worker, and the two men developed a friendship. Mr. Nichols would regularly allow defendant to shower and change clothes at his home, and defendant would eat dinner with Mr. Nichols and his family on occasion. At this time, defendant had assumed the alias of "Max Nietzsche," and he fraudulently held himself out as a Marine who had just been released from Walter Reed Hospital.

Mr. Nichols at some point decided to move his family to North Carolina to change schools for his children and because Mr. Nichols wanted to start another construction business. As Mr. Nichols planned his family's move, he offered to arrange for defendant to move to North Carolina to help Mr. Nichols start his business, and defendant accepted the offer. The weekend of 24 August 2006, Mr. Nichols moved to Winston-Salem where he planned to build a house for his family. That weekend, Mr. Nichols met Loyola Strader and began renting a room in Mrs.

Strader's house to live in while he built his family's house. Mrs. Strader lived separately from her husband although they had a good relationship.

Mr. Nichols arranged for his longtime girlfriend, Claudia Turner, and Ms. Turner's sister to bring defendant down with them when Ms. Turner and the rest of Mr. Nichols' family moved to Winston-Salem. On 14 November 2006, Mr. Nichols finished work on his house, and Ms. Turner, her sister, and defendant drove from Maryland to Winston-Salem. That day, since Mr. Nichols would be moving into his new house and defendant would need a place to stay, Mr. Nichols arranged with Mrs. Strader for defendant to succeed him as Mrs. Strader's tenant. When discussing defendant's stay with Mrs. Strader, Mr. Nichols did not know that "Max Nietzsche" was an alias, and he was not aware that defendant was a fugitive from the State of Maryland.

Defendant moved into Mrs. Strader's house on 14 November 2006. At some point that evening, Mrs. Strader noticed a picture of a girl who appeared to be a minor on defendant's laptop, and she asked him about the girl. Defendant replied that the girl was a runaway he knew from Maryland and that he had been in contact with her because he was trying to convince her to return home. Mrs. Strader told defendant that helping the girl was none of defendant's business and defendant would end up in trouble. The girl was 14 years old at the time.

The next day on 15 November 2006, defendant helped Mr. Nichols and his family move into their new house. Throughout the day, Mr. Nichols overheard defendant on his cell phone. When Mr. Nichols asked defendant who he was talking to, defendant replied that he was talking with a "young lady at home that he was looking after, that her parents were treating her bad or something." The "young lady" was the same girl in the picture on defendant's laptop.

At the end of that day, around 10:00 or 10:30 p.m., Mr. Nichols drove defendant back to Mrs. Strader's house. Defendant and Mrs. Strader discussed the lease in the kitchen, but around 10:30 or 10:45 p.m. Mrs. Strader told defendant that she was going to inform the police defendant was having sex with the girl pictured on his laptop. Defendant and Mrs. Strader became engaged in a physical struggle, ending up in the kitchen. Defendant ended the altercation by strangling Mrs. Strader with the power cord of a fan, and she died from asphyxiation. The struggle also caused the kitchen table to move and some glass to break on the kitchen floor.

Defendant then cleaned up the kitchen, placed Mrs. Strader's body in a blanket, and placed the body, along with several items, including the fan used to strangle Mrs. Strader, in Mrs. Strader's Nissan Sentra, which was titled in her husband's name. At around 2:00 a.m., defendant drove the Sentra from Mrs. Strader's house on Konnoak View Drive to Holder Road, where he purposefully ran the car into a ditch. Defendant moved Mrs. Strader's body to the driver's seat, doused

Mrs. Strader and the Sentra in gasoline, and set the car ablaze. Defendant then left in a cab for Mrs. Strader's house. A battery servicing business with surveillance cameras on Holder Road recorded defendant's actions.

Later that morning, around 7:30 a.m. on 16 November 2006, officers from the Forsyth County Sheriff's Office ("FCSO") began investigating the burning of the Sentra. After talking with Mr. Strader and discovering that he owned the Sentra but Mrs. Strader drove it, officers went to Mrs. Strader's house for further investigation. Lieutenant Josh Foster of the FCSO knocked on the front door and encountered defendant. When Lieutenant Foster asked defendant to identify himself, defendant gave him "Max Nietzsche" as his name. Defendant told Lieutenant Foster he was 34 years old, although defendant was actually 27 years old at the time, and defendant also gave Lieutenant Foster a false date of birth. While officers were at Mrs. Strader's house, defendant showed the officers to Mrs. Strader's room, where defendant knocked on the door three times, tried the door knob, and lied, saying that the door was locked.

At that point, Mr. Nichols happened to call defendant to ask if he was ready to start working that day. Defendant told Mr. Nichols that law enforcement officers were at Mrs. Strader's house, investigating the disappearance of the Sentra. Mr. Nichols told defendant he was on his way over. Around this time, Lieutenant Foster asked defendant to accompany him to the FCSO to give a statement, and defendant

agreed to go after Mr. Nichols arrived. When Mr. Nichols arrived, defendant handed him a backpack and asked Mr. Nichols to wash the clothes that were in it, which Mr. Nichols thought was a "very unusual" request. Mr. Nichols gave the backpack to Lieutenant Foster -- it contained the clothes defendant had been wearing earlier that morning.

Defendant accompanied Lieutenant Foster to the FCSO. Defendant's fingerprints revealed to local authorities, for the first time, that defendant's name was not "Max Nietzsche" but Scott Robert Speakman. They also discovered that the state of Maryland had issued an arrest warrant for defendant for a parole violation. Defendant gave a statement in which he denied killing Mrs. Strader. Later that afternoon, defendant was arrested for the burning of Mrs. Strader's car and placed in the custody of the Forsyth County Detention Center.

At the detention center, Lieutenant Foster showed surveillance of defendant setting the Sentra on fire. After watching this video, defendant gave a second statement that was similar to his first one. Later, defendant gave a third statement, in which he stated that he was not involved in Mrs. Strader's death, although he admitted to cleaning up her kitchen and burning the Sentra with Mrs. Strader in it. Defendant then gave a fourth statement that did not change substantively from the previous one. During one of these statements, however, defendant stated, "I don't believe me. . . . I know what happened. I know I'm going to jail."

Two days later, defendant gave a fifth statement ("the confession") in which he admitted to committing the murder. In that statement, defendant explained that when Mrs. Strader confronted him about the young girl and threatened to report him, he told her he was leaving and went to his room, but Mrs. Strader followed him. There, Mrs. Strader grabbed one of defendant's stun guns off a table and accidentally shocked herself but then began to grab at him. They struggled into the living room, where defendant put his hand over Mrs. Strader's mouth to muffle her screaming. Defendant stated Mrs. Strader grabbed for his throat, and defendant pushed her to the floor with a blow to her throat. Mrs. Strader got up and went to the kitchen, yelling that she would call the police, and defendant pursued her. In the kitchen, defendant told Mrs. Strader to "shut up, and that he just wanted to leave," and he noticed a fan sitting on the floor. He grabbed the power cord of the fan, but because "he couldn't hold [it] tightly enough[,] [he] wrapped it around his right hand to get a better grip. [Defendant] then wrapped that cord around [Mrs.] Strader's neck." Mrs. Strader fell and "eventually she started choking and her face began to turn blue and eventually she stopped breathing."

Defendant was indicted for first degree murder and burning of personal property. At trial, defendant testified that he had nothing to do with the murder. On the evening of 15 November 2006, at around 10:00 p.m., he helped Mrs. Strader unload some groceries and talked about rent. After about an hour, defendant decided

to go smoke marijuana on the back porch. However, as he was walking out the back door, he heard someone knock on the front door and then defendant left. When defendant returned around midnight, he found Mrs. Strader lying dead on the kitchen floor and testified that because he thought he would get blamed for her murder, he decided to clean everything up and dispose of her body. On cross-examination, defendant explained that in 2006, he was released from prison for convictions of various sexual offenses and was on probation on the condition that he would register as a sex offender with the state of Maryland and that he would abstain from unsupervised contact with persons younger than 18 years. He testified that he knew he was a fugitive and faced prison time if arrested.

Although defendant requested an instruction on voluntary manslaughter, the jury was instructed on first and second degree murder only, as well as burning personal property. The jury found defendant guilty of first degree murder and burning personal property. On 19 August 2013, the trial court sentenced defendant to life imprisonment without parole for first degree murder followed by a term of 10 to 12 months imprisonment for burning of personal property. Defendant timely appealed to this Court.

I

Defendant first argues that the trial court erred in failing to dismiss the charge of first degree murder for insufficient evidence of premeditation and deliberation.

> In reviewing challenges to the sufficiency of evidence, we must view the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. The test for sufficiency of the evidence is the same whether the evidence is direct or circumstantial or both. Circumstantial evidence may withstand a motion to dismiss and support a conviction even when the evidence does not rule out every hypothesis of innocence. . . .
>
> . . . In addition, the defendant's evidence should be disregarded unless it is favorable to the State or does not conflict with the State's evidence.

*State v. Fritsch*, 351 N.C. 373, 378-79, 526 S.E.2d 451, 455 (2000) (internal citations and quotation marks omitted).

First degree murder includes the intentional and unlawful killing of a human being with premeditation and deliberation. N.C. Gen. Stat. § 14-17 (2013). "Premeditation means that the act was thought over beforehand for some length of time, however short. Deliberation means an intent to kill, carried out in a cool state of blood, . . . and not under the influence of a violent passion or a sufficient legal provocation." *State v. Leazer*, 353 N.C. 234, 238, 539 S.E.2d 922, 925 (2000) (internal citations and quotation marks omitted). "The phrase 'cool state of blood' means that the defendant's anger or emotion must not have been such as to overcome the defendant's reason." *State v. Hunt*, 330 N.C. 425, 427, 410 S.E.2d 478, 480 (1991).

The Supreme Court has further explained that

Premeditation and deliberation are mental processes which are ordinarily not susceptible to proof by direct evidence. In a majority of cases, they must be proved by circumstantial evidence. Some of the circumstances from which premeditation and deliberation may be implied are (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.

*State v. Olson*, 330 N.C. 557, 565, 411 S.E.2d 592, 596 (1992).

"[D]eath by strangulation has been characterized by [the Supreme] Court . . . as vicious and brutal . . . ." *State v. Artis*, 325 N.C. 278, 311, 384 S.E.2d 470, 488 (1989), *judgment vacated on other grounds*, *Artis v. North Carolina*, 494 U.S. 1023, 108 L. Ed. 2d 604, 110 S. Ct. 1466 (1990). Therefore, the Court has held, "[a] jury may infer premeditation and deliberation from the circumstances of a killing, including that death was by strangulation." *State v. Richardson*, 328 N.C. 505, 513, 402 S.E.2d 401, 406 (1991).

Here, although defendant asserts the evidence shows that the strangulation happened instantaneously and without premeditation or deliberation, the fact that defendant strangled Mrs. Strader is sufficient, under *Richardson*, to support a jury verdict of first degree murder based on premeditation and deliberation. Indeed,

defendant's confession indicates the strangulation happened slowly, as Mrs. Strader's "face began to turn blue and eventually she stopped breathing."

The State presented other evidence of premeditation and deliberation apart from the strangulation. First, the State's evidence showed that defendant had a motive to kill -- to avoid prison -- which the Supreme Court has explained is relevant to the issue of premeditation and deliberation. *See State v. Chapman*, 359 N.C. 328, 375, 611 S.E.2d 794, 827 (2005) ("While evidence of motive is not essential to a determination of premeditation and deliberation, evidence of motive for the commission of a crime is relevant to that determination and is admissible."). Further, defendant tried to cover up the murder by disposing of evidence from the kitchen and burning Mrs. Strader's body. Defendant then misled law enforcement officers in their investigation by giving false information. *See State v. Parker*, 354 N.C. 268, 280, 553 S.E.2d 885, 895 (2001) (finding evidence of premeditation and deliberation where "[i]n interviews with police investigators, defendant's accounts conflicted concerning the events surrounding the victim's death"); *State v. Hunt*, 345 N.C. 720, 728, 483 S.E.2d 417, 422 (1997) (finding evidence of premeditation and deliberation when "[a]fter killing the victim defendant acted rationally in disposing of the victim's body, the victim's clothes, the murder weapon, and his own clothes and in cleaning the automobile"); *State v. Patel*, 217 N.C. App. 50, 62, 719 S.E.2d 101, 109 (2011) ("[T]he

fact that [the victim's] body was burned after she was killed constitutes additional evidence of premeditation and deliberation.").

Defendant nonetheless contends that there was no evidence that he "was not under the influence of a violent passion at the time of the homicide" because he "was provoked by Mrs. Strader's assaults." In support of this contention, defendant cites *State v. Corn*, 303 N.C. 293, 278 S.E.2d 221 (1981), and *State v. Williams*, 144 N.C. App. 526, 548 S.E.2d 802 (2001), *aff'd per curiam*, 355 N.C. 272, 559 S.E.2d 787 (2002). In *Corn*, the defendant and the victim got into an argument at defendant's apartment while the victim was intoxicated. 303 N.C. at 295, 278 S.E.2d at 222. The defendant knew that the victim had a history of violence when he was intoxicated. *Id.* at 296, 278 S.E.2d at 222. During the argument, "defendant jumped up, pulled a .22 caliber rifle from a crack between the sofa cushion and the back of the sofa, and shot [the victim] eight to ten times across the chest, killing him instantly." *Id.* at 295, 278 S.E.2d at 222. "Defendant did not . . . exhibit any conduct which would indicate that he formed any intention to kill him prior to the incident in question. There was no significant history of arguments or ill will between the parties. Although defendant shot deceased several times, there is no evidence that any shots were fired after [the victim] fell or that defendant dealt any blows to the body once the shooting ended." *Id.* at 298, 278 S.E.2d at 224. Therefore, "[a]ll the evidence tend[ed] to show that defendant shot [the victim] . . . in a state of passion[.]" *Id.*

In *Williams*, the defendant and the victim were attending a fight in a club parking lot. 144 N.C. App. at 527, 548 S.E.2d at 803. The victim "punched defendant in the jaw . . . . Defendant produced a handgun and fired a shot which struck [the victim] in the neck. [The victim's friend] testified that the series of events 'didn't take no time.' " *Id.*, 548 S.E.2d at 803-04. This Court found "no evidence of animosity . . . . Furthermore, the defendant was provoked by [the victim's] assault to which defendant immediately retaliated by firing one shot resulting in the immediate cessation of the altercation after [the victim] fell. Finally, . . . [a]fter committing the crime in front of a crowd of bystanders, defendant left the scene immediately but turned himself in the next day." *Id.* at 531, 548 S.E.2d at 805. This Court found no evidence that the defendant "was 'not under the influence of a violent passion.' " *Id.*

In light of *Corn* and *Williams*, defendant points to the portions of his confession in which he claimed that, after Mrs. Strader threatened to report defendant to the police, she pursued defendant into his bedroom and "grabbed one of the stun guns off the table," that she "physically grabb[ed] him" and "kept grabbing him and screaming[,]" and that there was a struggle in the kitchen. However, " 'passion does not always reduce the crime [of first degree murder] since a man may deliberate, may premeditate, and may intend to kill after premeditation and deliberation, although prompted and to a large extent controlled by passion at the time.' " *State v. Faust*,

254 N.C. 101, 108, 118 S.E.2d 769, 773 (1961) (quoting 40 C.J.S., *Homicide*, s. 33(d), pp. 889, 890).

Here, in contrast to *Corn* and *Williams*, even assuming defendant was provoked by Mrs. Strader and acted with some degree of passion, the State presented abundant evidence of premeditation and deliberation -- the State's evidence does not suggest that he was acting only under a violent passion. Unlike the evidence in *Corn* and *Williams*, defendant, in this case, engaged in a prolonged struggle with Mrs. Strader after she threatened to report him to the police. At some point, rather than just striking her, he located a cord, wrapped it around his hand, and began strangling Mrs. Strader, continuing to do so after she fell and as "her face began to turn blue." Then, defendant tried to cover up the murder and mislead officers. We hold that the trial court properly denied defendant's motion to dismiss the charge of first degree murder.

## II

Defendant also contends that the trial court erred in failing to instruct the jury on voluntary manslaughter.

> Voluntary manslaughter is a lesser included offense of first-degree murder. A jury must be instructed on a lesser included offense only when evidence has been introduced from which the jury could properly find that the defendant had committed the lesser included offense. In order to receive an instruction on voluntary manslaughter, there must be evidence tending to show [a] killing [was] committed in the heat of passion suddenly aroused by

adequate provocation, or in the imperfect exercise of the
right of self-defense[.]

*State v. Simonovich*, 202 N.C. App. 49, 53, 688 S.E.2d 67, 71 (2010) (internal citations and quotation marks omitted).  Defendant contends the evidence supported the fact that he strangled Mrs. Strader under the influence of a violent passion, and, therefore, he was entitled to an instruction on voluntary manslaughter.

However, even assuming without deciding that the evidence supported a voluntary manslaughter instruction, defendant cannot show that the failure to give that instruction was prejudicial error.  Our Supreme Court has explained:

> [W]hen a jury is properly instructed on both first-degree and second-degree murder and returns a verdict of guilty of first-degree murder, the failure to instruct on voluntary manslaughter is harmless error.  Assuming . . . that the evidence warranted an instruction on voluntary manslaughter, the jury's verdict of first-degree murder and its rejection of second-degree murder, upon proper instructions, renders any error harmless.

*State v. Locklear*, 349 N.C. 118, 153-54, 505 S.E.2d 277, 298 (1998) (internal citations and quotation marks omitted).  Defendant does not challenge the jury's instruction on second degree murder.  Therefore, because the jury was properly instructed on both first and second degree murder, and the jury found defendant guilty of first degree murder rather than second degree murder, we hold, pursuant to *Locklear*, that the trial court did not commit prejudicial error in refusing to instruct the jury on voluntary manslaughter.

NO ERROR.

Judges STEELMAN and DIETZ concur.

Report per Rule 30(e).