INMAN, Judge.
 

 *403
 
 Bobby Lee Gordon, Jr. ("Defendant") appeals from a judgment after a jury found him guilty of attempted first-degree rape, first-degree
 
 *404
 
 kidnapping, and first-degree sexual offense. On appeal, Defendant argues that the trial court erred by failing to dismiss the charge of first-degree kidnapping based upon insufficient evidence that the victim was not released in a safe place, failing to give the jury a curative instruction after sustaining defense counsel's objection to the prosecutor's allegedly improper statement during closing argument, and failing to intervene
 
 ex mero motu
 
 to an additional allegedly improper statement. After a thorough review of the record, relevant law, and arguments of the parties, we hold that Defendant received a trial free from error; as such, we affirm the judgment against him.
 

 Factual & Procedural History
 

 The State's evidence tended to show:
 

 On 27 April 2009, Sue
 
 [1]
 
 was walking on Main Street in High Point, filling out job applications at various businesses. Defendant stopped the white truck he was driving a couple of times to ask Sue if she wanted a ride. She responded that she did not need a ride.
 

 When Sue started walking home, she observed the white truck pass her and turn around. Defendant pulled up beside her, pointed a gun at her head, and said, "Get into the truck and do what I tell you to do and I won't kill you." Sue got in the truck and Defendant said, "We are going to go see my girlfriend. I just want to make her jealous." While he drove, Defendant kept the gun pointed at Sue. She begged him to let her go. After about six or seven minutes of driving, Defendant turned onto an access ramp off Interstate 85. He eventually stopped the truck in "a little
 
 *405
 
 dirt patch area" in a "very wooded area" that was "almost impossible to see from the highway." Defendant told Sue to take her clothes off.
 

 Sue opened the door to Defendant's truck, whereupon he grabbed her throat. The two then wrestled to the ground. Defendant placed his hands around Sue's neck and strangled her for a couple of minutes. While they were on the ground, Defendant fired his gun near Sue's left ear. Sue testified that the gun was about one foot away from her head when it fired. She stopped fighting because she "thought he was going to kill
 
 *662
 
 [her] at that point." Sue noticed that Defendant's gun had a white or pearl handle.
 

 Defendant asked Sue for her belt. She refused to give it to him and said that she was not going to take off her clothes. Defendant then tried to rip off her pants and Sue took off her belt. Defendant continued his efforts to remove Sue's clothes and told her that he would let her go if he saw her private parts. When she refused, the struggle resumed. Defendant inserted his fingers into Sue's vagina. Defendant's pants were down and he attempted to penetrate Sue with his penis; however, Sue, who was on her back, continued to kick and push him. Sue testified that the struggle lasted fifteen to twenty minutes.
 

 Defendant stopped struggling with Sue and allowed her to put her clothes on. He took her belt and driver's license and said, "I know where you live. If you tell anybody I will come back and I will kill you." He asked Sue whether she had made any calls on her cell phone. She showed Defendant her recent call history. Defendant got in his truck. Sue ran into the wooded area and watched Defendant's truck drive away. She then ran across the four-lane highway into her back yard. Sue immediately called her roommate and explained what had just transpired. He called the police, who arrived at Sue's apartment in about ten minutes. Sue gave the officer a statement of the events.
 

 Because she was afraid to stay in High Point, Sue moved to Jacksonville, Florida a couple of months after the incident. Sue testified that she had never met Defendant before the day he assaulted her, and did not know his name until she was contacted two years later by Detective Melanie Leonard. Detective Leonard, the detective handling the case, asked Sue to view a photo lineup, which officers in Florida administered. Sue selected Defendant's photograph. Subsequently, Detective Leonard called Sue and asked her to rate on a scale of one to ten her certainty that the photo she selected was that of her assailant. Sue responded that it was a "seven." At trial, Sue testified that Defendant "is the man that held [her] at gunpoint in 2009."
 

 *406
 
 Detective Mark Barnes of the Davidson County Sheriff's Office testified that on 28 December 2012, he assisted the High Point Police Department in executing a search warrant at Defendant's address. Defendant asked what the search was about, and Detective Barnes responded that he did not know. Defendant then explained that he knew what it was about, that it involved a girl who was walking down the street in High Point about two years earlier. He said that he had stopped and picked her up, that they bought some drugs, and then went back to his place and partied. He said that he gave her $30.00 and "took her down the road and put her out."
 

 Officers searched a Buick LeSabre parked in Defendant's yard. They found a silver handgun with a pearl grip handle. While the officers were searching Defendant's residence, Defendant's mother pulled up in a white pickup truck.
 

 Defendant's evidence tended to show:
 

 Defendant's sister, Julie Ann Gordon Quick, testified that Defendant brought Sue into her place of work in January or February 2009. After Defendant's arrest in 2013, Ms. Quick was able to identify Sue as her brother's date back in 2009 by searching her name on Facebook. The prosecutor elicited from Ms. Quick that she never told law enforcement that her brother had dated Sue in early 2009. She further testified that her mother owned a GMC Sonoma truck in April 2009.
 

 Defendant's mother, Gloria Elaine Gordon, testified that around Easter of 2009, her son brought Sue by her house. She did not see Sue again until she testified at Defendant's trial. She further testified that she owned a 1995 GMC Sonoma pickup truck in April of 2009, but it had been in Deborah Wright's transmission shop on 22 April 2009. She explained that she paid Ms. Wright by check for the repairs on 5 May 2009. She testified that she had located the work ticket that Deborah Wright had produced when the clutch job on the truck was paid for. The work ticket, Defendant's Exhibit 7, identified the vehicle as a Chevrolet S-10 and bore no date. Deborah Wright testified that she had no way of knowing when she worked on Ms.
 
 *663
 
 Gordon's truck because it had been "several years."
 

 On 27 December 2012, Defendant was charged with first-degree kidnapping, attempted first-degree rape, assault by strangulation, and first-degree sexual offense against a female. On 11 March 2013, he was indicted on the same charges. On 15 December 2014, the charges were joined for trial before Judge R. Stuart Albright. Defendant pled not guilty and was tried before a jury. On 17 December 2014, the jury found
 
 *407
 
 Defendant guilty of attempted first-degree rape, first-degree kidnapping, and first-degree sexual offense. Defendant was acquitted of assault by strangulation. The trial court sentenced Defendant to consecutive terms of 288 to 355 months imprisonment for the first-degree sexual offense conviction, 189 to 236 months for the attempted first-degree rape conviction, and 100 to 129 months for the first-degree kidnapping conviction. Defendant gave timely notice of appeal.
 

 Analysis
 

 I. First-Degree Kidnapping
 

 Defendant argues that the trial court erred in failing to dismiss the charge of first-degree kidnapping because there was insufficient evidence that Sue was not released in a safe place. Defendant asserts that because the State failed to show that Sue was not released in a safe place, this Court should vacate his conviction for first-degree kidnapping and send the case back to the trial court with instructions to enter a judgment of second-degree kidnapping. We disagree.
 

 A. Standard of Review
 

 "This Court reviews the trial court's denial of a motion to dismiss
 
 de novo.
 
 "
 
 State v. Smith,
 

 186 N.C.App. 57
 
 , 62,
 
 650 S.E.2d 29
 
 , 33 (2007) (citation omitted). " 'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.' "
 
 State v. Fritsch,
 

 351 N.C. 373
 
 , 378,
 
 526 S.E.2d 451
 
 , 455 (2000) (quoting
 
 State v. Barnes,
 

 334 N.C. 67
 
 , 75,
 
 430 S.E.2d 914
 
 , 918 (1993) ). "In deciding whether sufficient evidence was presented from which the jury could reasonably infer that the victim was not released in a safe place, we consider the evidence in the light most favorable to the State, giving the State every reasonable inference to be drawn therefrom."
 
 State v. White,
 

 127 N.C.App. 565
 
 , 572,
 
 492 S.E.2d 48
 
 , 52 (1997).
 

 B. Analysis
 

 North Carolina General Statute § 14-39(b) creates two degrees of kidnapping:
 

 If the person kidnapped either was not released by the defendant in a safe place or had been seriously injured or sexually assaulted, the offense is kidnapping in the first degree and is punishable as a Class C felony. If the person
 
 *408
 
 kidnapped was released in a safe place by the defendant and had not been seriously injured or sexually assaulted, the offense is kidnapping in the second degree and is punishable as a Class E felony.
 

 N.C. Gen.Stat. § 14-39(b) (2015).
 

 The indictment for first-degree kidnapping alleged that Sue was not released in a safe place and was sexually assaulted; however, during the instruction conference, the State indicated that it would not proceed on the allegation that Sue was sexually assaulted as a predicate for first-degree kidnapping. The trial court submitted to the jury the charge of first-degree kidnapping based on the allegation that Sue was not released in a safe place.
 

 "[T]he General Assembly has neither defined nor given guidance as to the meaning of the term 'safe place' in relation to the offense of first-degree kidnapping."
 
 State v. Sakobie,
 

 157 N.C.App. 275
 
 , 282,
 
 579 S.E.2d 125
 
 , 130 (2003). "Further, the cases that have focused on whether or not the release of a victim was in a safe place have been decided by our Courts on a case-by-case approach, relying on the particular facts of each case."
 
 Id.
 
 at 280,
 
 579 S.E.2d at 129
 
 . "Releasing a person in a safe place implies a conscious, willful action on the part of the defendant to assure that his victim is released in a place of safety."
 
 State v. Karshia
 

 *664
 

 Bliamy Ly,
 

 189 N.C.App. 422
 
 , 428,
 
 658 S.E.2d 300
 
 , 305 (2008) (internal quotation marks and citations omitted). "Mere relinquishment of dominion or control over the person is not sufficient to effectuate a release in a safe place."
 

 Id.
 

 Defendant argues Sue was "released" in a safe place because she was "released in daylight hours; in an area she was familiar with; with her clothes, and her cell phone; and was able to walk from the wooded area she was familiar with across a highway into her back yard to her apartment." However, Defendant left Sue in a clearing in the woods located near, but not easily visible from, a service road that extended off an exit ramp for Business Interstate 85. Deputies described the area as "very, very remote" and "very, very secluded ... at that time of the year, it was a very, very wooded area, it's almost impossible to see from the highway[.]" After the assault concluded, Sue, in a traumatized state, had to walk out of the clearing, down an embankment, and across a four-lane highway to get to her apartment. Defendant did not take any affirmative steps to release Sue in a location where she was no longer exposed to harm. He chose to abandon Sue in the same secluded location he had chosen to assault her.
 

 *409
 
 We hold that this evidence is sufficient to permit a reasonable juror to infer that the victim was not "released by the defendant in a safe place" within the meaning and intent of that phrase as used in N.C. Gen.Stat. § 14-39(b). Therefore, the trial court did not err by denying Defendant's motions to dismiss the first-degree kidnapping charge.
 

 II. Curative Jury Instruction/
 
 Ex Mero Motu
 
 Intervention
 

 Defendant contends that the trial court erred in: (1) failing to give the jury a curative instruction after sustaining defense counsel's objection to the prosecutor's allegedly improper statement, and (2) failing to intervene
 
 ex mero motu
 
 to remedy the statement.
 

 A. Standard of Review
 

 The North Carolina Supreme Court "has firmly established that 'trial counsel are granted wide latitude in the scope of jury argument, and control of closing arguments is in the discretion of the trial court.' "
 
 State v. Thomas,
 

 350 N.C. 315
 
 , 360,
 
 514 S.E.2d 486
 
 , 513 (1999) (quoting
 
 State v. Soyars,
 

 332 N.C. 47
 
 , 60,
 
 418 S.E.2d 480
 
 , 487 (1992) ). "The trial court has a duty, upon objection, to censor remarks not warranted by either the evidence or the law, or remarks calculated to mislead or prejudice the jury. If the impropriety is gross it is proper for the court even in the absence of objection to correct the abuse
 
 ex mero motu.
 
 "
 
 State v. Monk,
 

 286 N.C. 509
 
 , 516,
 
 212 S.E.2d 125
 
 , 131 (1975).
 

 The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu.
 
 In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.
 

 State v. Jones,
 

 355 N.C. 117
 
 , 133,
 
 558 S.E.2d 97
 
 , 107 (2002) (internal citations omitted).
 

 *410
 

 B. Analysis
 

 Section 15A-1230 of the North Carolina General Statutes provides in pertinent part:
 

 (a) During a closing argument to the jury an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record except for matters concerning which the court may take judicial notice.
 

 N.C. Gen.Stat. § 15A-1230 (2015).
 

 Defendant contends that the prosecutor interjected his personal opinions in violation of N.C. Gen.Stat. § 15A-1230 and the trial court erred in its inactions, first, to give
 
 *665
 
 a curative instruction and, second, to intervene
 
 ex mero motu
 
 to an additional improper statement. Specifically, Defendant argues that the prosecutor's statement was improper because he expressed his personal belief as to the truthfulness or falsity of the evidence. The statement Defendant contends was improper, however, is one portion of a sentence, quoted outside the context of the entire sentence. The North Carolina Supreme Court has held that "[i]n determining possible prejudice arising from improper arguments, we consider an allegedly improper statement in its broader context, as particular prosecutorial arguments are not viewed in an isolated vacuum."
 
 State v. Peterson,
 

 361 N.C. 587
 
 , 603,
 
 652 S.E.2d 216
 
 , 227 (2007) (internal quotation marks and citations omitted);
 
 see also
 

 State v. Cummings,
 

 352 N.C. 600
 
 , 621,
 
 536 S.E.2d 36
 
 , 52 (2000) ("To determine the propriety of the prosecution's argument, the Court must review the argument in context and analyze the import of the argument within the trial context, including the evidence and all arguments of counsel."). We therefore review the challenged portion of the prosecutor's closing argument in this broad context.
 

 Early in the argument, the prosecutor stated:
 

 Now, I asked everybody a question during jury selection, do you have common sense. Everybody always says yes. No shocker. I've never had a no answer to that. But that's what we're looking for here today. Use your common sense. And it's not just about these items. It's about your everyday interactions with people. It's about what you have learned and picked up through your development
 
 *411
 
 and maturity as a human being. It's about what you know about people that makes you think they're telling the truth.
 

 The prosecutor went on to discuss the relevant facts of the case and asked the jury whether it made sense that Sue would contrive the facts that she reported to her roommate and the police in April of 2009 to assist the State in charging and convicting her unknown assailant years later. He then discussed how Sue may have appeared during her testimony:
 

 And you know, maybe she could have done a little bit better. Maybe she would have presented better. Maybe she could have taken some drama classes or some speech therapy or whatever it would take to make her present better. But you know, she's genuine. She's absolutely genuine. And when you sit there and you watch her testify, and you watch the fear in her eyes when she sits over there and looks at him, even though he has changed his appearance since then, apparently for you-all, you're entitled to go, based on my reason, my common sense and my interactions with people as I have grown to be as old as I am, I think she is telling the truth.
 

 The defense attorney objected and the trial court sustained his objection. The prosecutor then clarified that, "I'm just arguing they should think she's telling the truth. I'm sorry, Judge, I misstated. You should be able to say, after watching her testify, that you think she is telling the truth."
 

 At the outset, we consider the propriety of the prosecutor's statement that, "based on my reason, my common sense and my interactions with people as I have grown to be as old as I am, I think she is telling the truth." Because the defense counsel objected to this statement, we must determine whether the remark was "not warranted by either the evidence or the law, or ... [was] calculated to mislead or prejudice the jury."
 
 Monk,
 

 286 N.C. at 516
 
 ,
 
 212 S.E.2d at 131
 
 . A review of the transcript reveals that one theme of the prosecutor's closing argument was about employing one's common sense and experience to determine the credibility of the witnesses. Taken in context, the sentence follows a second person narrative:
 

 And when you sit there and you watch her testify, and you watch the fear in her eyes when she sits over there and looks at him, even though he has changed his appearance since then, apparently for you-all, you're entitled to go,
 
 *412
 
 based on my reason, my common sense and my interactions with people as I have grown to be as old as I am, I think she is telling the truth.
 

 Viewed in a broader context, the prosecutor's statement refers to the jurors' perspective on the testimony. The prosecutor's use of the
 
 *666
 
 introductory phrase "you're entitled to go," demonstrates that the prosecutor was urging jurors to weigh Sue's testimony for themselves. Additionally, the prosecutor clarified the issue instantaneously by stating, "I am just arguing they should think she's telling the truth. I'm sorry, Judge. I misstated." Under these circumstances, we hold that the prosecutor's statement, which was further clarified, was not in violation of the law or calculated to mislead or prejudice the jury.
 

 Exercising an abundance of caution, the trial court sustained defense counsel's objection and the prosecutor clarified what he meant. Defendant contends that the trial court erred in failing to give a curative instruction to the jury after sustaining defense counsel's objection. We reject this argument because the North Carolina Supreme Court and this Court have held "it is not error for the trial court to fail to give a curative jury instruction after sustaining an objection, when defendant does not request such an instruction."
 
 State v. Williams,
 

 350 N.C. 1
 
 , 24,
 
 510 S.E.2d 626
 
 , 642,
 
 cert. denied,
 

 528 U.S. 880
 
 ,
 
 120 S.Ct. 193
 
 ,
 
 145 L.Ed.2d 162
 
 (1999) ;
 
 see also
 

 State v. Hunter,
 

 208 N.C.App. 506
 
 , 517,
 
 703 S.E.2d 776
 
 , 784 (2010) ;
 
 State v. Williamson,
 

 333 N.C. 128
 
 ,
 
 423 S.E.2d 766
 
 (1992). Moreover, we note that that the trial court issued general instructions to the jury at the outset of the trial:
 

 It is the right of the attorneys to object when testimony or other evidence is offered that the attorney believes is not admissible. When the Court sustains an objection to a question, you must disregard the question and the answer, if one has been given, and draw no inference from the question or answer or guess as to what the witness would have said if permitted to answer.
 

 This Court has held that such "instructions are sufficient to cure any prejudicial effect suffered by defendant regarding evidence to which an objection was raised and sustained."
 
 State v. Vines,
 

 105 N.C.App. 147
 
 , 153,
 
 412 S.E.2d 156
 
 , 161 (1992). For these reasons, the trial court did not err by failing to give a curative instruction.
 

 Defendant next contends that the trial court erred by not intervening
 
 ex mero motu
 
 to the prosecutor's clarifying statement that, "I'm just arguing they should think she's telling the truth. I'm sorry, Judge, I
 
 *413
 
 misstated. You should be able to say, after watching her testify, that you think she is telling the truth." Because defense counsel did not object to this statement, we review "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene
 
 ex mero motu.
 
 "
 
 Jones,
 

 355 N.C. at 133
 
 ,
 
 558 S.E.2d at 107
 
 . This statement did not interject the prosecutor's personal belief but instead provided further clarification as to the prosecutor's prior statement asking jurors to use their own common sense and experience in determining a witness's credibility. Furthermore, Defendant has failed to show that he was prejudiced by the prosecutor's statements.
 
 See
 

 State v. Brown,
 

 182 N.C.App. 277
 
 , 285,
 
 641 S.E.2d 850
 
 , 855 (2007) ("[The] defendant has failed to show this Court how the prosecutor's statements prejudiced him and resulted in a jury verdict which would not have been reached absent the statements. Therefore, we hold the trial court did not abuse its discretion in denying defendant's motion."). We hold that the prosecutor's jury argument was not so grossly improper as to require the trial court's intervention
 
 ex mero motu.
 

 Conclusion
 

 For the aforementioned reasons, we hold that Defendant received a fair trial, free from error.
 

 NO ERROR.
 

 Judges STEPHENS and HUNTER, JR. concur.
 

 [1]
 

 To preserve the privacy of the victim, we hereinafter refer to her by the pseudonym "Sue." In his brief on appeal, Defendant refers to the victim as "Sue" in an effort to follow the preferred policy of this Court. The State, however, chose to use the victim's full name throughout.
 

 Traditionally, the practice of employing pseudonyms for victims of sexual offenses has been limited to instances involving minors, in accordance with N.C. R.App. P. 4(e) (2009). Although it has never been officially ruled or codified by any court in this State, we find it good practice to preserve the privacy of victims, regardless of age, in appeals from sexual offense cases.
 
 See
 

 State v. Henderson,
 

 233 N.C.App. 538
 
 , 538,
 
 756 S.E.2d 860
 
 , 861 (2014) ("[I]t is the policy of the North Carolina Indigent Defense Services 'to shield the identities of victims of sexual crimes in appellate filings' regardless of age.... We recommend that the State also observe such a policy.") (brackets omitted).
 

 The victim, although often a key witness in a criminal action, is not a named party. Furthermore, the identity of the victim may be protected on appellate review at no critical risk to a defendant's case. Criminal cases based upon sexual assault are worthy of the State's attention and concern matters of a sensitive and highly personal nature for which there may be a risk of retaliatory physical or mental harm to the victim.