IN THE COURT OF APPEALS OF NORTH CAROLINA

No. CO22-768

Filed 7 November 2023

Carteret County, No. 18 CRS 53515

STATE OF NORTH CAROLINA

v.

LEWIS VICTOR BRANCHE, III

Appeal by Defendant from judgment entered 5 April 2022 by Judge Joshua W. Willey, Jr., in Carteret County Superior Court. Heard in the Court of Appeals 24 August 2023.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Robert C. Montgomery, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Heidi Reiner, for Defendant.*

WOOD, Judge.

Lewis Victor Branche, III ("Defendant") admitted at trial, through counsel, to having killed Kristen Bennett ("Bennett"), the mother of his son. A jury convicted Defendant of first-degree murder based on theories of premeditation and deliberation as well as lying in wait. Defendant challenges his conviction based on sufficiency of the evidence. We hold substantial evidence supports his conviction based on premeditation and deliberation. We further hold the trial court did not err by admitting numerous gruesome photographs of the body, and the alleged errors

contained in the Prosecutor's closing argument did not prejudice Defendant. Therefore, we uphold Defendant's conviction of first-degree murder.

## I. <u>Factual and Procedural History</u>

At his trial, Defendant admitted, through counsel, he shot and killed Bennett on 14 August 2018. At the time of her death, Bennett was twenty-four years old and lived with Defendant and their five-year old son on Hibbs Road. Bennett worked as a waitress at a strip club, and Defendant worked at a car dealership. Defendant routinely carried a nine-millimeter handgun but was not known to carry a .22 pistol. Bennett's father, Chuck Bennett ("Chuck") heard Defendant and Bennett argue about the fact that Bennett worked at a strip club. Defendant voiced his displeasure about Bennett's employment, and Chuck described Defendant as "jealous" about it.

On the day of the murder, Ray Gray, Jr. ("Gray") had shopped at Food Lion in Newport and was driving home when he noticed two people fighting in a yard on Hibbs Road. Gray described the altercation as, "they were scrapping, having a fight." Gray decided he should intervene in the altercation, so he turned his car around and parked in a neighbor's driveway. Gray got out of his car, "walked towards the two that were fighting," and told them to stop. Gray was concerned about whether Bennett was being assaulted and about two children who were playing in a nearby sand pile. Gray stated Defendant and Bennett were flailing their arms in the air. Bennett was advancing on Defendant, and Defendant was backing up and trying to push Bennett back. Bennett told Gray to "get the F out of here," and Gray was only

on the scene for approximately two minutes. All of this occurred sometime between 1:30 p.m. and 1:45 p.m.

A different witness, Robert Taylor ("Robert"), had picked up a sandwich during his lunch break and was returning to work when he noticed a young lady, who was later identified as Bennett, walking along the side of the road. She appeared to Robert to be wiping her face. Another witness, Danny Taylor ("Danny"), was driving down Hibbs Road between 2:00 p.m. and 3:00 p.m. on the day of the murder when he saw a blue car pulled over on the side of the road as well as a woman resembling Bennett. Bennett owned a blue Chevrolet. One of the car doors was open and it looked to Danny like Bennett was getting ready to get into the car.

A camera installed at a church across the street from Defendant's and Bennett's residence captured their residence within its view. The camera captured the altercation between Defendant and Bennett at 1:40 p.m. as well as Gray pulling over and attempting to intervene at 1:43-1:44 p.m. Bennett's car pulled out of the driveway between 2:35 p.m. and 2:37 p.m. with Defendant and the two children inside but not Bennett. Bennett's car returned to the driveway between 2:57 p.m. and 2:58 p.m., and Defendant got out of the car. Finally, at 4:07 p.m., the camera captured Defendant pulling out of the driveway in his truck. According to Defendant, he was leaving to return to work.

A few minutes after 4:00 p.m. on the day of the murder, Defendant called Bennett's mother, Christy Bennett ("Christy"), who lived with Defendant and

Bennett at their residence on Hibbs Road, to tell her that he and Bennett had been in an argument and that Bennett threw a bottle of red juice at him which hit Christy's mattress and sprayed everywhere. Defendant told her he took the sheets off the mattress to launder them. Christy found this conversation odd. Two days later, Christy called 9-1-1 on 16 August 2018 to report Bennett's disappearance.

After Bennett's death, Defendant acted as though Bennett were simply missing by putting up missing persons fliers and telling people she left him. Defendant told law enforcement he returned home at approximately 2:30 p.m. on the day of the murder to find Bennett, some of her clothes, and her stripper bag missing. At 5:59 p.m., Defendant texted Bennett, "Hey girl." Later, he texted Bennett's father "to see if [Bennett] had said anything to him."

On 23 August 2018, behind Defendant's property, law enforcement found a very large pile of dead tree limbs piled up as well as fresh dirt and pine straw. Investigators removed the branches and found an indentation in the ground. Investigators used a probe to prod the dirt, and they smelled an odor of decomposition on it. They did not discover a body, but they did find a grave approximately five-foot-three inches long, thirty-four inches wide, and seventeen inches deep. Soil from this shallow grave was found to have trace amounts of blood in it.

Defendant was arrested for Bennett's murder on 4 September 2018. While incarcerated, Defendant had conversations with an inmate named William Greene ("Greene"), who agreed to provide information to law enforcement in exchange for a

potential dismissal of his own charges. Greene stated that Defendant told him he and Bennett had a big argument because he had seen texts on her phone to a number he did not recognize and had deleted the number from her phone. Bennett then walked away. Defendant took the kids elsewhere, drove back to pick up Bennett, and then returned to the house where they continued fighting. Defendant stated that Bennett threatened to show him videos of her performing fellatio on other people. Defendant told Greene that after Bennett's threat "something clicked off in his head and he just grabbed the gun that was on the counter and shot her in the back of the head." Greene told law enforcement Defendant said he had "lost it," and it was "out of nowhere." Defendant told Greene the gun he used to kill Bennett was "for shooting animals in the yard. . . . any little animal he would go out back, bang bang[.]" Defendant revealed to Greene he ultimately hid Bennett's body in a burn pit next to a doghouse located at Defendant's grandfather's house.

On 16 July 2019, acting on the information provided by Greene, investigators obtained permission from Defendant's grandfather to dig under the burn pit on his property. Investigators used a backhoe to carefully remove layers of earth. Investigators uncovered heavily decomposed remains wrapped in a tarp. The remains were identified as Bennett's, and the cause of death was a gunshot wound to the back of the head. The entrance wound was in the back of the skull. Bullet fragments found in the skull were determined to be from a .22 caliber gun that could

be either a rifle or handgun, but more likely a handgun. There was no other trauma to the bones other than that caused by the bullet.

Defendant's trial was held 29 March to 5 April 2022. At the close of the evidence, Defendant made a motion to dismiss the first-degree murder charge based on premeditation. The trial court denied the motion, finding "the evidence is sufficient to go to the jury on the issue of premeditation, deliberation." The State then gave notice it would seek to instruct on first-degree murder based on a theory of lying in wait.

At the charge conference, the State sought the lying in wait jury instruction. Defendant objected, arguing the relevant caselaw required facts demonstrating the perpetrator was stalking or following someone, which could not be the case here because Bennett was killed in her own dwelling. Defendant contended the circumstances of this case were no "different than any other domestic shooting that takes place." The trial court overruled Defendant's objections and instructed the jury on first-degree murder based on theories of lying in wait and premeditation and deliberation. The trial court also instructed the jury on second-degree murder.

The jury found Defendant guilty of first-degree murder on theories of both lying in wait and premeditation and deliberation. The trial court sentenced Defendant to a term of life imprisonment without parole. Defendant appealed pursuant to N.C. Gen. Stat. §§ 7A-27(b) and 15A-1444(a). All other relevant facts are provided as necessary in our analysis.

## II. <u>Analysis</u>

The issues before this Court are: (1) whether there was sufficient evidence for the jury to convict Defendant of first-degree murder based on theories of premeditation and deliberation and lying in wait; (2) whether the trial court erred by instructing the jury on lying in wait; (3) whether the trial court erred by admitting numerous gruesome photographs; and (4) whether certain statements by the Prosecutor during his closing argument prejudiced Defendant's trial. We address each argument in turn.

### A. Sufficiency of the Evidence

On the issue of whether there was sufficient evidence to submit the charge of first-degree murder to the jury based on theories of premeditation and deliberation and lying in wait, we adhere to the following standard of review:

> This Court reviews challenges to the sufficiency of the evidence de novo. Upon a defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of the defendant's being the perpetrator of such offense. We review the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences. Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The Court may consider both direct and circumstantial evidence, even when the evidence does not rule out every hypothesis of innocence.

*State v. Elder*, 278 N.C. App. 493, 499, 863 S.E.2d 256, 264 (2021) (citations, quotation

marks, and brackets omitted).

## 1. Premeditation and Deliberation

Our Supreme Court has defined "premeditation" and "deliberation" as follows:

> "Premeditation" means that the defendant formed the
> specific intent to kill the victim some period of time,
> however short, before the actual killing. "Deliberation"
> means an intent to kill executed by the defendant in a cool
> state of blood, in furtherance of a fixed design for revenge
> or to accomplish an unlawful purpose and not under the
> influence of a violent passion, suddenly aroused by lawful
> or just cause or legal provocation. . . . "[C]ool state of blood"
> does not mean an absence of passion and emotion. One
> may deliberate, may premeditate, and may intend to kill
> after premeditation and deliberation, although prompted
> and, to a large extent, controlled by passion at the time."

*State v. Bonney*, 329 N.C. 61, 77, 405 S.E.2d 145, 154 (1991) (citations omitted).

If the victim sufficiently provokes the perpetrator, the killing may not be

premeditated. *See State v. Taylor*, 337 N.C. 597, 607, 447 S.E.2d 360, 367 (1994).

However,

> [t]he fact that defendant was angry or emotional will not
> negate the element of deliberation during a killing unless
> there was anger or emotion strong enough to disturb
> defendant's ability to reason. Evidence that the defendant
> and the victim argued, without more, is insufficient to show
> that the defendant's anger was strong enough to disturb
> his ability to reason.

*State v. Geddie*, 345 N.C. 73, 94, 478 S.E.2d 146, 156 (1996) (brackets omitted).

Evidence regarding motive is probative of the "degree of the offense," although motive

itself is not an essential element of first-degree murder. *State v. Wiseman*, 178 N.C. 784, 791, 101 S.E. 629, 632 (1919).

Moreover, in reviewing the sufficiency of the evidence as it relates to premeditation and deliberation, this Court considers "the conduct and statements of the defendant before and after the killing." *State v. Rose*, 335 N.C. 301, 318, 439 S.E.2d 518, 527 (1994). As for a defendant's conduct after the killing, "any unseemly conduct towards the corpse of the person slain, or any indignity offered it by the slayer, as well as concealment of the body, are evidence of express malice, and of premeditation and deliberation in the slaying." *Id.* at 318, 439 S.E.2d at 527. For example, the *Rose* court upheld the defendant's conviction of first-degree murder in part because there was "evidence of an elaborate process of removing the body, bloody bedclothes and personal items from the scene of the killing." *Id.* at 319, 439 S.E.2d at 527. In *Rose,* the defendant cleaned the victim's apartment, hid the victim's body in one car before moving it to another, and ultimately transported the body to a remote location and buried it. *Id.* at 319. 439 S.E.2d at 527. The *Rose* court held "Defendant's handling of the body from the time of the killing until the body was finally burned and buried is evidence from which a jury could infer premeditation and deliberation." *Id.* at 319, 439 S.E.2d at 527. Additionally, in *State v. Patel*, this Court concluded, "the evidence of defendant's conduct . . . in disposing of the body after the murder was sufficient for a reasonable juror to conclude that defendant killed [the victim] with premeditation and deliberation." 217 N.C. App. 50, 63, 719 S.E.2d 101,

110 (2011). The *Patel* court reasoned, "the fact that [the victim's] body was burned after she was killed constitutes additional evidence of premeditation and deliberation." *Id.* at 62, 719 S.E.2d at 109. Finally, in *State v. Weathers*, our Supreme Court concluded there was sufficient evidence for the jury to find murder with premeditation and deliberation where:

> Defendant's conduct after the killing provides further evidence of premeditation and deliberation. Defendant went to great lengths to conceal the murder, including disposing of the body and destroying or hiding evidence such as the pipe, the sheets, and the mattress. Defendant's uncaring attitude about the victim, evidenced by killing her and then dumping her nude body by the roadside, could be considered by the jury in finding premeditation and deliberation.

339 N.C. 441, 452, 451 S.E.2d 266, 272 (1994).

Here, the evidence demonstrates Defendant was not "under the influence of a violent passion" to the point of murder during either the fight in the front yard nor at the moment he picked up Bennett while she was walking down the side of the road and brought her home. *Bonney*, 329 N.C. at 77, 405 S.E.2d at 154. Although Bennett advanced toward Defendant during their confrontation in front of the home and Defendant attempted to push her back, they were not physically fighting or attempting to hit one another. Greene testified the couple continued fighting even after Defendant picked her up in the car, and, according to Defendant, Bennett made threats arousing his jealousy after they returned home. However, neither instance demonstrates Defendant was impassioned to the point of losing his ability to reason.

*Geddie*, 345 N.C. at 94, 478 S.E.2d at 156. Defendant never physically lashed out at Bennett other than attempting to push her away from him as she advanced on him. As for her efforts to make him jealous, the jury could have—and likely did in this case—consider Bennett's threats to arouse jealousy as evidence showing Defendant's motivation to kill her rather than arousing "lawful or just cause or legal provocation." *Bonney*, 329 N.C. at 77, 405 S.E.2d at 154.

Even if Defendant did not form the specific intent to kill Bennett until some point after they returned to the house, there was sufficient evidence for the jury to conclude Defendant committed murder in the first-degree. First, the evidence Defendant argues supports second-degree murder, such as Bennett's work at a strip club and her verbal threats to Defendant to arouse his jealousy, could have demonstrated to a reasonable jury motive rather than provocation. *See Taylor*, 337 N.C. at 607, 447 S.E.2d at 367; *Wiseman*, 178 N.C. at 791, 101 S.E. at 632.

Second, the State argued the fact Defendant murdered Bennett with a .22 caliber handgun rather than with the nine-millimeter he customarily carried demonstrates some planning on his part. Specifically, the State argues the choice of the .22 caliber handgun to commit the crime was likely because such a gun is smaller and easier to dispose of, quieter, and less likely to make an exit wound and therefore less messy. Defendant argues Greene's testimony demonstrates the .22 caliber handgun just happened to be on the kitchen counter, and so it was just the weapon Defendant happened to grab in the heat of the moment. At trial, forensic scientist

Hope Bruehl testified the bullet was a .22 and more likely from a handgun than a rifle because it was all lead and not jacketed. Detective Joshua Phillips testified .22 handguns are normally smaller in size than other handguns and fire more quietly than higher caliber handguns. Viewing the evidence in the light most favorable to the State, the jury could have accepted the foregoing relevant evidence to support a conclusion that Defendant purposely chose the .22 caliber handgun rather than his nine-millimeter because the .22 is cleaner and quieter. *Elder*, 278 N.C. App. at 499, 863 S.E.2d at 264. Therefore, we conclude Defendant's choice to use the .22 caliber handgun constitutes evidence demonstrating premeditation and deliberation.

Third, and most importantly, Defendant's actions following the murder demonstrate a planned strategy to pretend Defendant had nothing to do with the murder and to avoid detection as the perpetrator. Defendant's actions, taken together, constitute a long-term, well-thought out, and strategic plan to avoid being discovered as the perpetrator. Defendant (1) called Bennett's mother to tell her a story he made up about Bennett throwing a bottle at him and red juice spraying on the bed causing him to do laundry; (2) told people Bennett left him; (3) texted Bennett at almost 6:00 p.m. although he knew she was dead; (4) played dumb in a text to Bennett's father about Bennett's whereabouts; (5) pretended to look for Bennett by posting fliers regarding her disappearance; (6) initially disposed of Bennett's body behind the house; and (7) relocated the body to a burn pit away from his home where it was less likely to be discovered by law enforcement. Defendant's conduct after the

murder supports first-degree murder based upon premeditation and deliberation because it shows Defendant "went to great lengths to conceal the murder," including initially burying the body behind his house and then reburying it on his grandfather's property. *Weathers*, 339 N.C. at 452, 451 S.E.2d at 272. Considered together, all of Defendant's carefully planned actions constituted substantial evidence for the jury to find Defendant committed the murder with premeditation and deliberation. *Weathers*, 339 N.C. at 452, 451 S.E.2d at 272.

Finally, Defendant, through counsel, admitted he shot and killed Bennett, constituting substantial evidence Defendant was the perpetrator of the offense. *Elder*, 278 N.C. App. at 499, 863 S.E.2d at 264. Because substantial evidence existed for the jury to determine (1) Defendant committed murder with premeditation and deliberation, and (2) Defendant was the perpetrator of the offense, the trial court did not err in denying Defendant's motion to dismiss.

Defendant argues this Court should not consider acts subsequent to a killing as evidence of premeditation and deliberation because of our Supreme Court's words in *State v. Steele*:

> Subsequent acts, including flight or hiding the body, or burning the bloody clothes and otherwise destroying traces of the crime, are competent on the question of guilt. The basis of this rule is that a guilty conscience influences conduct. From time immemorial it has been thus accepted:
>
> "The wicked flee when no man pursueth; but the righteous are bold as a lion." 28 Prov. 1.

> "Thus conscience doth make cowards of us all." Hamlet, Act III, scene I.

> "Guilty consciences always make people cowards." The Prince and his Minister, Pilpay, chap. III, Fable III.

> Flight is not evidence of premeditation and deliberation.

190 N.C. 506, 511, 130 S.E. 308, 312 (1925) (citations omitted). Specifically, Defendant argues the holding in *Steele* is controlling law which prevents this Court from considering acts subsequent to a killing as evidence of premeditation and deliberation and that later cases are misstatements of the law. We disagree. *Steele* holds flight, and flight alone, is not evidence of premeditation and deliberation. The *Steele* court states "subsequent acts" are relevant to guilt, but it does not hold that subsequent acts cannot be considered evidence of premeditation and deliberation. We conclude *Steele* means what it says and nothing more. Our courts have held that a defendant's subsequent acts other than flight are probative of premeditation and deliberation. *Patel*, 217 N.C. App. at 63, 719 S.E.2d at 110; *Rose*, 335 N.C. at 318, 439 S.E.2d at 527; *Weathers*, 339 N.C. at 452, 451 S.E.2d at 272.

Defendant further argues a seemingly exculpatory statement to Greene mandates we vacate his murder conviction based on premeditation and deliberation. Greene testified Defendant told him "something clicked off in his head and he just grabbed the gun that was on the counter and shot her in the back of the head." Indeed, our Supreme Court has held that "[w]hen the State introduces in evidence exculpatory statements of the defendant which are not contradicted or shown to be

false by any other facts or circumstances in evidence, the State is bound by these statements." *State v. Carter*, 254 N.C. 475, 479, 119 S.E.2d 461, 464 (1961). The *Carter* court further held the defendant's motion to dismiss should be granted "when the State's evidence and that of the defendant is to the same effect, and tend only to exculpate the defendant." 254 N.C. 475, 479, 119 S.E.2d 461, 464 (1961). "The introduction by the State of exculpatory statements by the defendant, however, does not prevent the State from introducing evidence which shows facts concerning the crime to be different from the incident as described by the exculpatory statements." *State v. Freeman*, 326 N.C. 40, 42–43, 387 S.E.2d 158, 159 (1990) (other evidence presented by the State supported defendant's premeditation and deliberation conviction even though defendant had told someone prior to the shooting that he was thinking of shooting the victim in the shoulder to "keep him under control") (quotation marks omitted). Because the State presented other evidence supporting Defendant's first-degree murder conviction, the holding in *Carter* does not compel us to vacate Defendant's conviction of murder by premeditation and deliberation.

## 2. Lying in Wait

A first-degree murder verdict as to one theory will stand even if such a verdict as to another theory fails. *See State v. McLemore*, 343 N.C. 240, 249, 470 S.E.2d 2, 7 (1996) (upholding the defendant's conviction based on premeditation and deliberation but finding error in his conviction based on felony murder). Moreover, provided the record demonstrates which "theory or theories the jury relied [upon] in arriving at its

verdict," there is no need for a new trial. *State v. Lynch*, 327 N.C. 210, 219, 393 S.E.2d 811, 816 (1990). Here, the jury marked the verdict form indicating it found Defendant guilty of first-degree murder based on both theories, premeditation and deliberation and lying in wait. Because we uphold Defendant's first-degree murder conviction based on premeditation and deliberation, we need not address the sufficiency of the evidence for the conviction based on lying in wait.

## B. Instructing the Jury on Lying in Wait

At trial, the State sought to instruct the jury on lying in wait over numerous objections by Defendant. The trial court ultimately decided to give the instruction. Defendant argues doing so constituted error based on insufficiency of the evidence Defendant committed first-degree murder by lying in wait. Thus, Defendant frames his argument regarding the giving of the instruction essentially in the same manner he argues the evidence was insufficient to convict on lying in wait. Accordingly, based on our discussion above, we need not separately address this argument.

## C. Introduction of Numerous Photographs

At trial, the State admitted approximately 150 photographs, including: (1) the tarp containing the body recovered from where Defendant reburied it; (2) tattered, dirty clothes and jewelry removed from the body; (3) the body in its decomposed state and with maggots; (4) arrangements of bones after the body was "rendered"; and (5) numerous photos of the skull, some showing the bullet hole. Defendant argues, based on N.C. R. Evid. 403, many photos were irrelevant, redundant, and prejudicial as

they were designed to prey on jurors' sympathies, and there was a reasonable probability the jury would have reached a different result had it not been subjected to so many such photos. We disagree.

Because Defendant did not object to the admission of photographic evidence at trial, we review for plain error. N.C. R. App. 10(a)(4); *see also State v. Miles*, 223 N.C. App. 160, 164, 733 S.E.2d 572, 575 (2012) ("[W]here there is no objection to the admission of the evidence at trial, we are limited to a review for plain error").

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." N.C. R. Evid. 403. "[P]hotographs showing the condition of the body and its location when found are competent despite their portrayal of a gruesome spectacle. This holds true even where the photographs depict remains in an advanced state of decomposition, and where the cause of death is uncontroverted." *State v. Harris*, 323 N.C. 112, 127, 371 S.E.2d 689, 698 (1988) (citations omitted). "Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *State v. Hennis*, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988).

Defendant argues we should reach the same conclusion as in *Hennis*, in which the court held repetitive, "grotesque and macabre" photos "added nothing to the [S]tate's case" and were therefore "only for inflaming the jurors." 323 N.C. at 286, 372 S.E.2d at 528. In *Hennis*, the court also found the manner in which the State presented the photographs compounded their prejudicial effect. Specifically, the *Hennis* court held the "erection of an unusually large screen on a wall directly over defendant's head such that the jury would continually have him in its vision as it viewed the slides" and the "thirty-five duplicative photographs published to the jury one at a time just before the state rested its case" were excessively redundant and "enhanced" the prejudicial effect. *Id.* at 286, 372 S.E.2d at 528.

Here, Defendant argues it was error for the trial court to allow the State to admit a "staggering 150+" photographs. It is not the volume of photographs that pose a potential issue in this case, but rather their content and whether they are overly duplicative or irrelevant. We hold they are not. We note that the vast majority of photos cannot be said to inflame the passion of jurors because they depict unemotional subjects, such as: aerial photos of the burn pit, including one photo which shows only trees and what looks like a field of grass; woods and dirt; investigators digging into the ground; a brush pile and a dirt hole; and entirely mundane photographs of the home, its yard, and surrounding fence.

Some photographs could be considered distressing but not rising to the level of potentially inflaming jurors, specifically depicting: the tarp in which Bennett's body

was wrapped; Bennett's hair sticking out of the tarp; dirty clothes and jewelry; and bones after the body was rendered. Although showing jurors photographs of Bennett's dirty clothes, jewelry, and rendered bones, along with the jurors' knowledge that they were sitting for a murder case, had potential to cause emotion, we cannot say such photographs were "grotesque and macabre," as Defendant argues. The photographs do not depict bloody, gory details of any injuries or any identifiable human features that would arouse jurors' sympathy for Bennett to the point of prejudicing their decision to find Defendant guilty based merely on such photographs. It is true that some photographs depicted Bennett's skull, making visible the bullet hole that killed Bennett. However, these photographs were highly relevant to the State's case in proving the cause of death and had some relevance to the charge of first-degree murder by lying in wait. Our Supreme Court recently stated "[t]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense. Even a stipulation as to the cause of death does not preclude the State from proving all essential elements of its case." *State v. Richardson*, ___ N.C. ___, ___ S.E.2d ___, 171 (2023) (citation and quotation marks omitted). Here, then, the danger of unfair prejudice did not substantially outweigh the photographs' probative value.

Certainly, the most distressing photographs depicted Bennett's decomposed body, and maggots were clearly visible in some. However, the photographs were used appropriately as evidence to help the State develop and illustrate testimony

regarding the extensive search and efforts required to find Bennett's body and to discover Defendant's actions to conceal it, as well as the breakthrough resulting from the information Greene provided regarding re-burial of the body. Defendant's actions subsequent to the murder, specifically his carefully executed plan to conceal the body, were relevant to the elements of premeditation and deliberation, making the difference between first- and second-degree murder. The photographs presented at trial depicted the culmination of the investigation to locate Bennett's body and provided evidence of premeditation and deliberation. *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526. Therefore, this case is distinguishable from *Hennis* because we cannot say such photographs "added nothing" to the State's case. Also, there are no facts suggesting the State presented the photos in such a prejudicial manner as in *Hennis*, such as how the photographs in that case were displayed unusually large and directly over the defendant's head, keeping the defendant in the jury's view the entire time. Accordingly, Defendant's argument fails, and we find no plain error in the trial court's admission of the photographs.

## D. **The State's Closing Arguments**

Defendant argues the trial court erred by failing to sustain objections to the Prosecutor's statements when he mentioned the punishment for second-degree murder, mentioned Defendant did not have to testify, and discussed the law regarding provocation. Defendant further argues the trial court erred by failing to

intervene *ex mero motu* when the Prosecutor commented on Defendant's failure to plead guilty.

As for the three statements to which Defendant objected, the issue is preserved, and we review the trial court's rulings for abuse of discretion. *State v. Walters*, 357 N.C. 68, 101, 588 S.E.2d 344, 364 (2003). Specifically, we determine whether "the remarks were improper," then whether "the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court." *Id.* at 101, 588 S.E.2d at 364.

Defendant did not object to the Prosecutor's comment regarding his failure to plead guilty. When a defendant fails to object to a Prosecutor's closing argument at trial, "this Court must determine if the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*," and specifically whether the trial court should have intervened by "(1) preclud[ing] other similar remarks from the offending attorney; and/or (2) instruct[ing] the jury to disregard the improper comments already made." *Id.*, 357 N.C. at 101, 588 S.E.2d at 364 (quotation marks omitted).

### 1. Mentioning the Punishment for Second-Degree Murder

Defendant contends the prosecutor appealed directly to the jurors' emotions by mentioning the punishment for second-degree murder as opposed to the punishment for first-degree murder. We note the trial court sustained Defendant's objection to

the Prosecutor's mention of the punishment for second-degree murder. During

closing argument, the Prosecutor stated:

> [Defendant's counsel] talked about punishment. The punishment is life without parole, first degree murder. What he's going to tell you, your decision is not to be based on what the punishment is or isn't. Saying what the punishment is simply impresses upon you the seriousness of your duty, and there's nobody that needs to impress that upon you. You already know that. You have already showed us that.
>
> *You know, if I wanted to really upset you, I could tell you the punishment for second-degree murder, minimum punishment for second-degree murder for this defendant, 93 months.*
>
> [DEFENDANT'S COUNSEL]: Objection.
>
> THE COURT: *Sustained.*

(Emphasis added.) However, following the ruling, the trial court did not give a

curative instruction.

A trial court's instructions can cure erroneous statements by a prosecutor.

*State v. Buckner*, 342 N.C. 198, 238, 464 S.E.2d 414, 437 (1995). Nevertheless, "it is

not error for the trial court to fail to give a curative jury instruction after sustaining

an objection, when defendant does not request such an instruction." *State v.

Williams*, 350 N.C. 1, 24, 510 S.E.2d 626, 642 (1999). General instructions given at

the outset of a trial may be "sufficient to cure any prejudicial effect suffered by [a]

defendant regarding evidence to which an objection was raised and sustained." *State

v. Gordon*, 248 N.C. App. 403, 412, 789 S.E.2d 659, 666 (2016).

Here, the trial court sustained Defendant's objection. Towards the beginning of the trial, the trial court instructed the jury, "When the Court sustains an objection to a question, you must disregard the question and the answer, if one is being given." The trial court additionally instructed the jury during the jury charge, "The jury should not acquit or convict a defendant based on the severity or lack of severity of punishment that will be imposed for the offense." Given the trial court's instructions, and even presuming the Prosecutor's statement was improper, we conclude the statement did not ultimately prejudice the outcome of Defendant's trial. *Walters*, 357 N.C. at 101, 588 S.E.2d at 364.

### 2. Mentioning Defendant Did Not Have to Testify

Defendant argues he was prejudiced by the Prosecutor mentioning Defendant did not have to testify because a prosecutor may not comment on a defendant's right not to testify. At trial, the Prosecutor stated in his closing argument:

> The Judge will tell you [Defendant] does not have to testify, and the fact that he does not testify cannot be used against him and I want you to make sure you don't use it against him. But that doesn't mean he can't call other witnesses -- any witness.
>
> [DEFENDANT'S COUNSEL]: Objection, Your Honor.
>
> THE COURT: Sustained.
>
> [THE STATE]: Judge, I can argue where are the witnesses.
>
> THE COURT: Well, overruled. Overruled.

> [THE STATE]: Where are the witnesses? Where is any
> witness?

A criminal defendant's privilege against self-incrimination is enshrined in our Constitution and law. N.C. Const. art. I, § 23; N.C. Gen. Stat. § 8-54. Our Supreme Court has held "any direct reference to defendant's failure to testify is error and requires curative measures be taken by the trial court." *State v. Reid*, 334 N.C. 551, 554, 434 S.E.2d 193, 196 (1993). Specifically, the State

> may comment on a defendant's failure to produce witnesses or exculpatory evidence to contradict or refute evidence presented by the State. However, a prosecution's argument which clearly suggests that a defendant has failed to testify is error. . . .
>
> When the State directly comments on a defendant's failure to testify, the improper comment is not cured by subsequent inclusion in the jury charge of an instruction on a defendant's right not to testify.

*Id.*, at 555–56, 434 S.E.2d at 196–97.

Whether a new trial is appropriate depends on the appellate court's determining whether "[c]omment on an accused's failure to testify . . . is harmless beyond a reasonable doubt." *Id.* at 557, 434 S.E.2d at 198. In applying *Reid*, this Court has focused on whether there was doubt as to the guilt of the defendant. *State v. Riley*, 128 N.C. App. 265, 270, 495 S.E.2d 181, 185 (1998). For example, in *Riley*, this Court concluded the prosecutor's statements during voir dire ("if you want that evidence in, you're going to put the defendant on the stand. . . . You have to let the defendant testify to it") constituted error meriting a new trial because there was

conflicting evidence at trial about who fired the gunshots. *Id.* at 269, 495 S.E.2d at 184.

Here, the facts are distinguishable from *Reid*. In *Reid*, the prosecutor stated in his closing argument, "Now defendant hasn't taken the stand in this case-" to which the defendant objected, and the trial court *overruled* the objection. *Id.* at 554, 434 S.E.2d at 196. Here, the trial court *sustained* Defendant's objection to the Prosecutor's mention of Defendant's failure to testify but overruled it to allow the Prosecutor to make an argument regarding Defendant's lack of witnesses. There is no doubt the Prosecutor's statement was improper. However, there also is no doubt regarding the identity of the perpetrator because Defendant, through counsel, admitted to having killed Bennett. In view of the trial court's sustaining Defendant's objection, the evidence of Defendant's motive for planning to kill Bennett, his confession, his use of the .22 caliber handgun, and his acts subsequent to the killing, we hold the Prosecutor's remark pertaining to Defendant's decision whether or not to testify is harmless beyond a reasonable doubt. *Reid*, 334 N.C. at 554, 434 S.E.2d at 196.

### 3. Statement of Law Regarding Provocation

At trial, the Prosecutor sought instructions regarding "mere words" not rising to the level of legal provocation from a case called *State v. Simonovich*, 202 N.C. App. 49, 54, 688 S.E.2d 67, 71 (2010). The trial court denied the State's request. Nevertheless, the Prosecutor proceeded to explain *Simonovich* in his closing

argument. Defendant objected, and the trial court overruled the objection. The Prosecutor explained to the jury, "*State versus Simonovich*, Court of Appeals, 2010. Provocation must be more than mere words as language, however abusive, neither excuses, nor mitigates killing. I'm not talking about cursing, flailing. We're talking about absolutely goading somebody into doing it."

*Simonovich* is inapposite here because it relates to provocation in the context of *voluntary manslaughter*, which is not at issue in this case. *Id.* at 54, 688 S.E.2d at 71. The relevant law regarding provocation in the context of first- versus second-degree murder is as follows:

> "The fact that defendant was angry or emotional will not negate the element of deliberation during a killing unless there was anger or emotion strong enough to disturb defendant's ability to reason. Evidence that the defendant and the victim argued, without more, is insufficient to show that the defendant's anger was strong enough to disturb his ability to reason."

*Geddie*, 345 N.C. at 94, 478 S.E.2d at 156 (citations, quotation marks, and brackets omitted).

A misstatement of law by a prosecutor may be "cured by proper instructions given by the trial court when it charge[s] the jury." *State v. Barden*, 356 N.C. 316, 366, 572 S.E.2d 108, 140 (2002). Here, although citing law relevant to voluntary manslaughter rather than first- or second-degree murder, the Prosecutor's explanation of the law is not very different from the correct law regarding provocation (*Simonovich*'s "mere words" versus *Geddie*'s arguing, "without more" not being

enough to mitigate first-degree murder). Moreover, the trial court properly instructed the jury it could not find Defendant guilty of first-degree murder if Defendant was under the influence of a violent passion. When instructing the jury on the law relevant to what the State must prove regarding malice, the trial court explained the State must prove:

> [D]efendant acted with deliberation, which means that the defendant acted while the defendant was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried out.

This explanation is the proper statement of law regarding the required state of mind for premeditation and deliberation, and we conclude it cured any misstatement of the law by the Prosecutor. *Barden*, 356 N.C. at 366, 572 S.E.2d at 140.

### 4. Mentioning the Defendant Failed to Plead Guilty

Defendant argues he was prejudiced by the Prosecutor mentioning Defendant admitted to killing Bennett through counsel but failed to plead guilty because a prosecutor may not comment on a defendant's failure to plead guilty or his exercise of the right to be tried by a jury. In his closing argument, the Prosecutor stated,

> The judge is going to tell you about first-degree murder. [Defendant's counsel] was kind enough to admit what his client could not deny, deny what his client could not admit, to being guilty of this. Killing another human being intentionally with malice, malice equals hatred or ill will

> or infliction of a wound with a deadly weapon to cause a death.
>
> I believe [Defendant's counsel] said that his client acted with malice and killed Kristen Bennett.

Defendant argues this statement constitutes an improper comment on Defendant's failure to plead guilty.

"A criminal defendant has a constitutional right to plead not guilty and be tried by a jury. Reference by the State to a defendant's failure to plead guilty violates his constitutional right to a jury trial." *State v. Degraffenried*, 262 N.C. App. 308, 310, 821 S.E.2d 887, 889 (2018) (brackets omitted). This Court's job is to determine "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* at 311, 821 S.E.2d at 889.

Here, the Prosecutor was building an argument regarding premeditation and deliberation, noting Defendant admitted to killing Bennett but not to what was the largest point of dispute at trial—the requisite intent for first-degree murder. For example, the Prosecutor continued: "[D]efendant, of course, caused the victim's death. . . . Okay. Premeditation and deliberation, this is what [Defendant's counsel] did not stipulate to. Because this makes his client guilty of first-degree murder. So we're going to break this down into common sense." We conclude the Prosecutor's comment was directed at what was and was not at issue for the jurors to decide rather than an improper statement regarding Defendant's failure to plead guilty. In any event, the Prosecutor's comment was not so grossly improper that the trial court failed to

intervene *ex mero motu* because it was much more clearly a reference to what the jurors were already well aware of (Defendant's admission, through counsel, regarding the killing) than a targeted attack on Defendant's failure to plead guilty.

## III. <u>Conclusion</u>

For the foregoing reasons, we hold substantial evidence supported Defendant's jury conviction for first-degree murder based on premeditation and deliberation, and thus, we do not address the sufficiency of the evidence with regard to the theory of lying in wait. We further hold the admission of numerous and graphic photographs did not constitute plain error in a case focused on Defendant's acts subsequent to the murder as they related to premeditation and deliberation. Finally, we hold the alleged improper statements in the Prosecutor's closing argument did not prejudice Defendant. Consequently, we hold Defendant received a fair trial, free from prejudicial error.

NO ERROR.

Judges ZACHARY and FLOOD concur.